## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

COOPER CROUSE-HINDS, LLC,

      Plaintiff,

v.

CITY OF SYRACUSE, NEW YORK,

and

COUNTY OF ONONDAGA, NEW YORK

      Defendants.

Case No. 5:16-cv-1201 (MAD/ATB)

CIVIL ACTION

## COMPLAINT

Plaintiff Cooper Crouse-Hinds, LLC ("**Plaintiff**" or "**Cooper**"), by and through its attorneys, hereby alleges as follows:

## NATURE OF ACTION

1.   This is a civil action brought by Cooper against the City of Syracuse, New York ("**City**") and the County of Onondaga, New York ("**County**," and together with the City, the "**Defendants**") for recovery of response costs, contribution, damages, indemnification, restitution, and declaratory, injunctive and other relief pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601 *et seq.* ("**CERCLA**"), the New York Inactive Hazardous Waste Disposal Site Remedial Program Law, N.Y. Envtl. Conserv. Law §§ 27-1301 *et seq.* ("**State Superfund Law**"), the New York Oil Spill Act, N.Y. Nav. Law §§ 12-170 *et seq.* ("**Spill Act**"), contract and common law, in

connection with releases, threatened releases, discharges and contamination arising out of the Defendants' disposals of wastes containing hazardous substances, including polychlorinated biphenyls ("**PCBs**") and other pollutants, at, in and upon two sites ("**Sites**") located in Syracuse and Salina, New York owned by Cooper.

## THE PARTIES

2.      Plaintiff Cooper is a Limited Liability Company formed in Delaware with its principal place of business at 1201 Wolf Street, Syracuse, New York 13208.

3.      Cooper is a person as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), Section 27-1301(4) of the State Superfund Law, N.Y. Envtl. Conserv. Law § 27-1301(4), and Section 12-172(14) of the Spill Act, N.Y. Nav. Law § 12-172(14).

4.      Defendant City of Syracuse is a New York municipal corporation with its principal place of business at Syracuse, New York and its mailing address at Syracuse Corporation Counsel, City Hall, Syracuse, New York 13202.

5.      The City is a person as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), Section 27-1301(4) of the State Superfund Law, N.Y. Envtl. Conserv. Law § 27-1301(4), and Section 12-172(14) of the Spill Act, N.Y. Nav. Law § 12-172(14).

6.      Defendant County of Onondaga is a county of New York with its mailing address at Onondaga County Attorney, Civic Center, Syracuse, New York 13202.

7.      The County is a person as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), Section 27-1301(4) of the State Superfund Law, N.Y. Envtl. Conserv. Law § 27-1301(4), and Section 12-172(14) of the Spill Act, N.Y. Nav. Law § 12-172(14).

## JURISDICTION AND VENUE

8.     This action arises under Section 107 of CERCLA, 42 U.S.C. § 9607, Section 113 of CERCLA, 42 U.S.C. § 9613, Sections 27-1313(3) and 27-1313(5) of the State Superfund Law, N.Y. Envtl. Conserv. Law §§ 27-1313(3) & (5), Section 1401 of the New York Civil Practice Laws and Rules, N.Y. C.P.L.R. § 1401, Section 12-176(8) of the Spill Act, N.Y. Nav. Law § 12-176(8), contract and common law.

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity).

10.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Cooper's state law claims under the State Superfund Law, the Spill Act, the New York Civil Practice Laws and Rules, contract and common law because they are so related to Cooper's federal claims that they form part of the same case or controversy.

11.    This Court has authority to enter a declaratory judgment regarding the rights and liabilities of the parties pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201 & 2202, Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the State Superfund Law, the Spill Act, the New York Civil Practice Laws and Rules and common law.

12.    Venue is proper in this Court pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1391(b)(1) & (2), because both Defendants reside in this District, and the events giving rise to the claims, including the Defendants' disposals and the subsequent releases or threatened releases and discharges of hazardous substances, petroleum or other pollutants, occurred in this District and the Sites are located entirely within this District.

## FACTUAL BACKGROUND

### The North and South Landfill Sites

13.    The Crouse-Hinds Electric Company, a manufacturer of specialty electrical equipment, was founded in Syracuse in 1897 and operated throughout the 1900s. It subsequently changed its name to the Crouse-Hinds Company ("**Crouse-Hinds**"). On April 2, 1981, Cooper Industries, Inc. acquired Crouse-Hinds, which subsequently became a subsidiary and was renamed Cooper Crouse-Hinds, LLC.

14.    In approximately 1911, Crouse-Hinds constructed a manufacturing facility ("**Crouse-Hinds Facility**") at Seventh North Street and Wolf Street in Syracuse. Cooper owns and continues to operate the Crouse-Hinds Facility to this day.

15.    From 1911 to 1948, Crouse-Hinds acquired parcels of land to the west and southwest of the Crouse-Hinds Facility. This additional land comprises the two Sites, which are separated by Seventh North Street (as shown in **Exhibit A**). The Sites were both undeveloped until the mid-1950s.

16.    In the mid-1950s, Crouse-Hinds began using a 21.5-acre portion of the Site located on the northeast side of Seventh North Street in the Town of Salina to dispose of plant trash from the Crouse-Hinds Facility ("**Plant Trash**") composed primarily of solid waste, foundry sands and cores, scrap wood, and other debris. This Site came to be known as the "North Landfill" ("**North Landfill Site**"). The North Landfill Site is bounded to the northwest, north and east by property owned by Plaza East, LLC ("**Plaza East**"). *See* Ex. A. Disposal operations at the North Landfill ended in 1989.

17.    In 1960, disposal operations also commenced on a 19.4-acre portion of the other Site, located on the southwest side of Seventh North Street in the City of Syracuse. This Site

came to be known as the "South Landfill" ("**South Landfill Site**").  The South Landfill Site is bounded to the northwest by Ley Creek.  *See* Ex. A.  Crouse-Hinds also used the South Landfill for the disposal of Plant Trash.  Disposal operations at the South Landfill ended in 1969.

### The City's Waste Disposal Activities at the Sites

18.     On November 4, 1960, Crouse-Hinds and the City of Syracuse Department of Public Works ("**City DPW**") entered into a written Indenture agreement ("**1960 Indenture**," copy attached as **Exhibit B**), under which the City DPW was permitted to use the South Landfill Site "for the purpose of refuse disposal of waste" at no cost.  The 1960 Indenture required the City DPW to conduct these operations "in a lawful manner at the City's sole risk, responsibility and expense."

19.     The 1960 Indenture further provided, *inter alia*:

> The City hereby agrees to release, indemnify and save harmless the Owner [Crouse-Hinds] from and against any and all … loss, injury and damage and any and all claims, demands, actions, judgments, costs, expenses (including, without limitation, reasonable counsel fees) and liabilities of every name and nature which may or result directly or indirectly from or by reason of any such loss, injury or damage or from or by reason of the failure of the City fully to keep, perform, observe and fulfill any of the covenants, conditions or restrictions herein ….

Ex. B at pp. 2-3.  The City also agreed to "release, indemnify and save harmless" Crouse-Hinds under other contractual agreements, such as an August 12, 1968 Indenture allowing the City to build, operate, repair and maintain a right of way across a 50-foot wide strip of land owned by Crouse-Hinds for a period of two years.

20.     Pursuant to the 1960 Indenture, the City DPW cleaned out, widened and deepened certain tributaries to Ley Creek which traversed both Sites beginning in late 1960 or early 1961. It also extended, cleaned out and deepened culverts at the Sites.  The City also cleaned out the Ley Creek channel west of Seventh North Street for 1,800 feet along the South Landfill Site.

- 5 -

21.     In 1961, the City cleaned out and restored a drainage ditch along the southeast boundary of the North Landfill Site and established a new drainage ditch and settling basin along the southeast boundary of the South Landfill Site, near Wetland C.  *See* Ex. A.

22.     A 1965 "Chronology of Compliance With City Dump License" documents that in 1964, the City used a dragline to dredge the Ley Creek channel "and put the resulting muck on [the] dump area" at the Sites.

23.     All of these activities were conducted by the City DPW under the 1960 Indenture. In conjunction with these activities and associated work, the City dredged sediments and debris from Ley Creek and its tributaries and drainage ditches.  On information and belief, these dredged spoils contained hazardous substances and were disposed of by the City in, on and about both the South Landfill and North Landfill Sites.

24.     In 1996 and 1997, the New York State Department of Environmental Conservation ("**NYSDEC**") conducted  sediment sampling of the Ley Creek channel and its tributaries.  This sampling demonstrated that the Ley Creek sediments were contaminated with PCBs (Aroclors 1016, 1248, 1254, 1260), volatile organic compounds ("**VOCs**"), semi-volatile organic compounds ("**SVOCs**") and metals in excess of NYSDEC screening criteria.  Because concentrations of PCBs in sediment samples taken upstream of the Sites were higher than those detected adjacent to and downstream of the Sites, this indicated that the PCBs came from an upstream source not associated with the Sites.  The City's disposals of dredged spoils from Ley Creek resulted in releases or threatened releases of hazardous substances, including PCBs, at or from the Sites, which caused the incurrence of response costs by Cooper.

25.     From approximately 1961 to at least 1965, the City disposed of approximately 2,000 cubic yards of municipal, commercial and industrial wastes per week at the South Landfill

Site pursuant to the 1960 Indenture.  The total volume of waste disposed of by the City was over 520,000 cubic yards, approximately one-half of all the wastes placed in the South Landfill.

26.     In November 1963, Cooper notified the City that it had failed to cover "acres and acres" of waste material as required by the 1960 Indenture.  This was because the City had placed waste over the dirt that it was supposed to have used for cover.  The City also had failed to construct a dike as it had committed to do.  To address these deficiencies, the City undertook to dredge out the Ley Creek channel in order to use the spoils to build the dike and as cover material.

27.     In January 1964, Cooper again notified the City of poor conditions at the South Landfill and the need for cover material.  By the end of January 1964, Crouse-Hinds had again met with the City to establish a June 15, 1964 deadline for completing topsoil cover.

28.     Local newspaper articles in February 1964 described significant operational violations by the City at the South Landfill, including the City's allowance of wastes to enter Ley Creek.  A February 9, 1964 newspaper article reported that instead of using clean topsoil, the City attempted to cover the waste materials by placing dredged spoils from Ley Creek over landfilled wastes, thereby contaminating the South Landfill with PCBs and other hazardous substances contained in the dredged sediments.

29.     By August 1965, the City ceased disposal activities but the work required by the 1960 Indenture remained incomplete.  Conditions at the South Landfill had deteriorated to the point that New York State regulatory authorities had twice contacted Crouse-Hinds regarding the need for cleanup due to violations of the State Health Law.  Upon information and belief, after Crouse-Hinds communicated the State's requests to the City, the City, rather than addressing conditions at the Site, contacted State regulatory authorities to postpone regulatory action.

30.     Subsequently, the City entered into a lease with Plaza East, the owner of the property adjacent to the North Landfill Site, allowing the City to dispose of municipal waste there from approximately 1965 to the 1970s.

31.     To facilitate the City's use of the Plaza East property, Crouse-Hinds transferred a 100-foot wide strip of land along the entrance of the North Landfill off of Seventh North Street, allowing the City to build an access road across the former North Landfill Site to deliver municipal wastes to the Plaza East property.  Construction of this road required fill material. Upon information and belief, the City obtained some or all of this fill from contaminated sediments it dredged from Ley Creek.

32.     During subsequent investigations in 2004, wastes characteristic of those deposited by the City in the South Landfill were found within the North Landfill and along the boundary between the North Landfill and Plaza East property, indicating that the City had engaged in unauthorized waste disposal activities on the North Landfill Site as well.

<u>The County's Waste Disposal Activities at the Sites</u>

33.     During the 1970s, in order to address flooding issues, the County formed the Bear Trap-Ley Creek Drainage District and entered into multiple contracts to dredge Ley Creek by widening and deepening its channel.

34.     On August 30, 1972, the County and Crouse-Hinds entered into an Option Agreement (**"Option Agreement**," copy attached as **Exhibit C**) by which Crouse-Hinds transferred to the County title to a strip of land approximately 1.4 acres in size located along the western border of the North Landfill Site near Wetland B (*see* Ex. A) and adjacent to Ley Creek. The Option Agreement also granted the County a right of way along the western border of the

South Landfill Site, also adjacent to Ley Creek (*see* Ex. A), so that the County could undertake widening and deepening of the Ley Creek channel.

35.     The County completed this Ley Creek dredging and drainage channel improvement work on the South Landfill Site in 1973.   As part of this work, the County constructed a dike in the southwest corner of the South Landfill Site and spread contaminated dredged spoils from Ley Creek over the southwest corner of the South Landfill Site in the area of Wetland C.   *See* Ex. A.   The County's disposals of dredged spoils from Ley Creek resulted in releases or threatened releases of hazardous substances, including PCBs, at or from the Sites, which caused the incurrence of response costs by Cooper.

36.     The Option Agreement provided, *inter alia*, that "the County shall … [p]rohibit and prevent any public nuisance on the subject parcels." Ex. C, p. 3.  It further provided:

> the County shall defend, save harmless and indemnify Crouse-Hinds from and against any and all claims against Crouse-Hinds and any and all loss, costs, damages or expenses (including without limitation reasonable counsel fees) which Crouse-Hinds may suffer, sustain, or incur by reason of bodily injury (or claims thereof) to any persons whomsoever, or any damages to the real or personal property of Crouse-Hinds or of any other person, firm or corporation (or claims thereof) arising or which shall be claimed to have arisen out of the County's use of the premises described herein before transfer of title, and the County's use, if any, of Crouse-Hinds' property not herein described, whether or not the occurrence giving rise to such claims shall have been due to the negligent act or omission of the County or its contractors, agents or invitees.

Ex. C, pp. 6-7.

37.     Inspection reports by the County's engineering contractor, Calocerinos & Spina, from October 1972 to February 1973 indicate that excavated spoils from Ley Creek were being placed directly on the southwest corner of the South Landfill Site and the right of way along the North and South Landfill Sites.  For example, an October 17, 1972 inspection report documents

excavation of the channel and the "spread[ing of] spoils," including "off R.O.W. + on spoils area."

38.     A February 9, 1973 Calocerinos & Spina memo documents that Crouse-Hinds notified the County's engineer that the County had improperly placed dredged spoils on Crouse-Hinds' property.

39.     On information and belief, dredged spoils also apparently were deposited on the North Landfill as part of work performed under the County's "Burko Channel Excavation 1973" contract.  On information and belief, dredged spoils also appear to have been deposited on other areas of the Sites during these and other related projects, as well as onto the Plaza East property and along the border of the Sites, allowing contamination to migrate onto the Sites.

40.  The Ley Creek sediments dredged and disposed of at the Sites by the County were contaminated with PCBs and other hazardous substances, just like those disposed of at the Sites by the City.

41.     Neither Crouse-Hinds nor its successors used PCBs in their operations. Therefore, Crouse-Hinds' Plant Trash could not have been the source of the PCBs found at the Sites.  On information and belief, all of the PCB contamination at the Sites was due to the actions of the City and the County.

42.     The August 5, 2009 Remedial Investigation Report ("**RI Report**") for the Sites concluded that PCB contamination at the Sites "appear to be attributable to the disposal of PCB impacted materials on the adjacent Plaza property, from materials migrating from former sediment dredge spoils that were removed from Ley Creek during historic channel dredging activities that are known to contain PCBs, from migration of PCB impacted sediment over time from Ley Creek through the low lying and wetland areas located to the north of the North landfill

and via flooding from Ley Creek[.]   Upstream sources of PCB impacts to sediments in Ley Creek include the Town of Salina Landfill, the Old Ley Creek Channel site, the Ley Creek PCB Dredging Site and the GM-IFG site."

43.     On information and belief, the County also disposed of contaminated dredged soils from Ley Creek and its tributaries at some of these other upstream sites in the 1970s and/or 1980s, which later migrated downstream to the Sites.  For example, the RI Report notes that the County also may have disposed of PCB-contaminated spoils at the Old Ley Creek Channel Site, which is reportedly owned by Plaza and is located 1,600 feet upstream of the Sites.  Similarly, the RI Report notes that the County also disposed of PCB-contaminated dredged spoils from Ley Creek at the Ley Creek PCB Dredging Site, located approximately two miles upstream from the Sites.  A March 7, 2011 letter to NYSDEC from the County's legal counsel stated "the County does not dispute and in fact, concurs that the primary source of historic and on-going contamination to Ley Creek is up gradient of [the Sites]."  On information and belief, these upstream disposals of PCB-contaminated spoils by the County also resulted in disposals and releases of hazardous substances at the Sites which caused Cooper to incur response costs and other damages.

<u>Subsequent Investigations of Contamination at the Sites</u>

44.     In 1985, following various environmental assessments, NYSDEC designated the North and South Landfills as a Class 2 Inactive Hazardous Waste Disposal Site (Site No. 7-34-004) under the State Superfund Program.

45.     Cooper later entered into a consent order dated May 14, 2004 with NYSDEC ("**2004 Consent Order**"), pursuant to which Cooper undertook, at its expense, sampling investigations and studies and implemented interim response measures at the Sites.

46.    On September 29, 2004, Cooper submitted a Preliminary Site Assessment report to NYSDEC, the EPA and the New York State Department of Health.   After conducting supplemental wetlands sampling, Cooper submitted to NYSDEC a Supplemental Site Assessment Report in May 2006.   Cooper's investigatory work included sampling and analysis of surface soils, groundwater and leachate from the Landfills, surface water and sediments from drainage channels and Ley Creek, and soil and waste samples from excavated test pits.

47.    Pursuant to an approved work plan, Cooper submitted to NYSDEC the RI Report on August 5, 2009 followed by a Feasibility Study in April 2010.   Cooper next developed work plans to delineate "hot spots" of contamination and to survey landfill gas in August 2010 and October 2010, respectively, followed by sampling of such hot spots in November 2010.

48.    Concurrently with those investigations, Cooper also undertook certain interim measures pursuant to the 2004 Consent Order from December 2006 through Summer 2008. These interim measures included (i) control and prevention of migration of contaminated sediments in an area designated as Wetland A along the eastern side of the North Landfill, (ii) evaluation and removal of free-phase petroleum product at the North Landfill, (iii) installation of a security fence along the South and North Landfill boundaries, and (iv) additional sediment and surface water sampling.

49.    The investigation activities identified three "hot spots" in the North Landfill with elevated concentrations of hazardous substances: (i) an area on the east side of approximately 750 cubic yards of material with PCB concentrations exceeding 50 ppm, (ii) a second area also on the east side with approximately 4,500 cubic yards of waste with elevated solvent concentrations, and (iii) an area on the west side with approximately 1,500 cubic yards of oily waste. In addition, waste was found on the North Landfill Site along its northern and

northeastern boundary with the Plaza East property, evidencing the City's unauthorized disposal of waste there.

50.     Sampling from Cooper's remedial investigations showed that the Sites exceeded applicable NYSDEC standards for a number of hazardous substances, including benzene, chlorobenzene, 1,4-dichlorobenzene, PCBs, benzo(a)pyrene, phenol, arsenic, cadmium and chromium.

Cooper's Implementation of the NYSDEC-Approved Remedy

51.     On February 27, 2011, a public meeting was held at which NYSDEC presented the results of the Remedial Investigation and Feasibility Study undertaken by Cooper and discussed the Proposed Remedial Action Plan ("**PRAP**") for the Sites.  Representatives of both the City and the County attended this public meeting.  Consequently, the Defendants were well aware of the nature of the contamination at the Sites, as well as the needed remedy.  On March 7, 2011, the County submitted written comments to the PRAP which are part of the Administrative Record.

52.     On March 31, 2011, NYSDEC issued a Record of Decision ("**ROD**") summarizing the investigation findings and outlining the selected remedy for the Sites.  The ROD noted that the "estimated present worth cost to implement the remedy" was $12.5 million.

53.     Cooper committed to implement the selected remedy by entering into a Remedial Design/Remedial Action consent order ("**2011 RD/RA Consent Order**") with NYSDEC on August 29, 2011.  The ROD and 2011 RD/RA Consent Order prescribed short-term actions to characterize, remove and safely dispose of wastes, as well as remedial actions to address conditions at the Site over the long term.  Thereafter, Cooper promptly began implementing the response actions required under the 2011 RD/RA Consent Order.

54.    On April 26, 2012, NYSDEC approved Cooper's Remedial Design/Remedial Action Work Plan.  On October 10, 2012, Cooper's contractor, Penn E&R, began tree clearing in both Landfills and hot spot removal work in the North Landfill, as well as additional soil sampling.  This work was completed by December 3, 2012, and involved the excavation and proper off-site disposal of approximately 150 tons of PCB-impacted materials.  Cooper also removed 5,150 tons of petroleum-impacted soils from the Sites, which again was properly disposed of off-site.

55.    Despite the Defendants' failure to participate in the implementation or cost of the remedy, Cooper has consulted extensively with both the City and County during the remedy's design and implementation.  For example, from June through September 2013, Cooper consulted with the County to ensure that excavation work would not damage a 36-inch water line supplying the City located on the South Landfill Site.

56.    Cooper also addressed technical design comments from the City for both the North and the South Landfills in 2013, prior to the City's approval of Cooper's Stormwater Pollution Prevention Plan in January 2014.  Under the approved Plan, the City received weekly inspection reports relating to the Sites.

57.    The City also submitted design comments in 2013 relating to both Landfills, following review of the South Landfill's construction drawings by no fewer than seven agencies, in connection with issuance of a construction permit for the South Landfill in early 2014.  Finally, both City and County personnel have participated in several inspections of the Sites since that time.

58.     In November 2013, Cooper removed another approximately 500 tons of PCB-contaminated wastes from the North Landfill wetland areas and properly disposed of them off-site.

59.     In April 2014, NYSDEC approved the full Remedial Design for the North and South Landfills, and Cooper submitted a Construction Work Plan for this work.  The approved Remedial Design consisted of capping the North and South Landfills, creating buffer zones between the Landfill wastes and both Ley Creek (50-foot buffer zone) and the wetlands areas (30-foot buffer zone), excavation and disposal of hot spots, and restoration of impacted wetlands and the stream drainage channels.

60.     The engineered cap for the North Landfill totaled 14 acres in size and the cap for the South Landfill totaled 12 acres.  Cooper completed capping of the South Landfill in 2014.

61.     In 2015, Cooper properly disposed of an additional 825 tons of PCB-contaminated waste from the North Landfill off-site.   Capping of the North Landfill is now complete.

62.     Long-term maintenance and monitoring activities will be required at the Sites for the next 30 years.  The ROD contemplates development of a Site Management Plan, inspection and maintenance activities for the Sites' perimeter fencing, wetlands, drainage areas and caps, and ongoing methane, groundwater and surface water monitoring.

63.     To date, Cooper has incurred at least $11.9 million investigating and remediating the Sites.  In addition, future long-term operation and maintenance costs are estimated to be approximately $1.14 million over a period of 30 years (approximately $38,000 per year).

<u>The City and the County Have Failed to Contribute to the Cleanup</u>

64.     Despite the fact that Cooper has shared with the City and County the investigation findings demonstrating that they both contributed wastes containing PCBs, petroleum and other hazardous substances to the Sites, neither the City nor the County has made any financial contribution toward the response costs necessitated by their disposals of these wastes.

65.     Prior to filing suit, Cooper attempted to secure the Defendants' agreement to participate in the Sites' remedy costs consistent with their statutory and contractual liability.  In furtherance of these negotiations, Cooper, the City and the County all entered into a Standstill and Tolling Agreement, as well as several extensions thereof, tolling all of Cooper's "potential legal and contractual claims" for the period from August 25, 2014 through October 3, 2016.  Under this Agreement, the City and County agreed "that all statutes of limitations, laches, waiver, estoppel or other defenses or causes of action pertaining to the Potential Claims will be preserved."  However, these negotiations have been unsuccessful.

66.     Accordingly, Cooper now seeks relief from this Court for recovery of its cleanup costs and other damages incurred as a result of Defendants' disposals of wastes containing PCBs, petroleum and other hazardous substances at the Sites, as well as other appropriate and just relief.

<b>FIRST CAUSE OF ACTION:<br>COST RECOVERY UNDER CERCLA</b>

67.     The allegations set forth in paragraphs 1 through 66 are incorporated herein by reference as if set forth here in full.

68.     The Sites are a "facility" or "facilities" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

- 16 -

69.     There have been releases and/or threatened releases of "hazardous substances" at the Sites within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

70.     The wastes disposed of by Defendants at the Sites contained "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

71.     Cooper is a "person" within the meaning of Section 101(21) and 107(a)(4)(B) of CERCLA, 42 U.S.C. §§ 9601(21) & 9607(a)(4)(B).

72.     Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

73.     Both Defendants are persons who, at the time of disposal of hazardous substances, operated the Sites, and therefore are liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

74.     Both Defendants are persons who by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by them at the Sites, and therefore are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

75.     The releases and/or threatened releases of hazardous substances at and from the Sites have caused the incurrence of response costs.

76.     Cooper has incurred, and will continue to incur, necessary costs of response as a result of the releases and/or threatened releases of hazardous substances at and from the Sites consistent with the National Contingency Plan, 40 C.F.R. Part 300, within the meaning of Section 101(31) of CERCLA, 42 U.S.C. § 9601(31).

77.     Cooper has incurred at least $11.9 million in such response costs with respect to the Sites as of the date of this Complaint, and will continue to incur additional such response costs in the future which may exceed $1.14 million.

78.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), each Defendant is strictly liable, jointly and severally, for all response costs incurred by Cooper to date and to be incurred in the future in connection with the Sites.

79.     Pursuant to Section 113(*l*) of CERCLA, 42 U.S.C. § 9613(*l*), Cooper has provided a copy of this Complaint to the Attorney General of the United States and the Administrator of EPA.

## SECOND CAUSE OF ACTION:
## CONTRIBUTION UNDER CERCLA

80.     The allegations made in paragraphs 1 through 79 are incorporated by reference as if set forth here in full.

81.     Cooper has incurred and will continue to incur liability and necessary costs of response due to releases and/or threatened releases of hazardous substances at and from the Sites for which Defendants are liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

82.     The 2011 RD/RA Consent Order is an administrative settlement within the meaning of Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

83.     Cooper is a person who has resolved its liability to the State of New York in an administrative settlement within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).

84.     Cooper is entitled to contribution under Section 113 of CERCLA, 42 U.S.C. § 9613, from both Defendants for some or all of the liability and response costs incurred and to be incurred by Cooper in connection with the Sites.

### THIRD CAUSE OF ACTION:
### DECLARATORY RELIEF UNDER CERCLA AND NEW YORK LAW

85.     The allegations made in paragraphs 1 through 84 are incorporated by reference as if set forth here in full.

86.     An actual controversy exists between Cooper and the Defendants concerning Defendants' liability for response costs incurred and to be incurred by Cooper in connection with the Sites for which Cooper contends Defendants are liable under CERCLA and New York law.

87.     Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Cooper is entitled to the entry of a declaratory judgment declaring that the Defendants are liable for necessary costs of response incurred to date and to be incurred by Cooper in the future at or in connection with the Sites.

88.     Likewise, pursuant to New York Civil Practice and Law Rules, N.Y. C.P.L.R. § 3001, Cooper is entitled to the entry of a declaratory judgment declaring that the Defendants are liable for damages incurred to date and to be incurred by Cooper in the future at or in connection with the Sites.

### FOURTH CAUSE OF ACTION:
### BREACH OF CONTRACT AND CONTRACTUAL INDEMNITY
### AGAINST THE CITY

89.     The allegations made in paragraphs 1 through 88 are incorporated by reference as if set forth here in full.

90.     The November 4, 1960 Indenture agreement is a valid and binding contract between Crouse-Hinds and the City of Syracuse which has never been terminated.

91.     Cooper has performed all of its obligations under the 1960 Indenture.

92.     Under the terms of the 1960 Indenture, the City "assume[d] all risk of and sole responsibility for loss of … property of or injury or damage to the … property of any person,

firm or corporation whatsoever (including, but without limitation, the parties hereto …), arising or resulting directly or indirectly, in whole or in part, from or by reason of the use by the City of the said premises [the South Landfill Site] …."  Ex. B at p. 2.

93.     Furthermore, the City agreed, *inter alia*, to "indemnify and save harmless" Cooper "from and against any and all … loss, injury and damage and any and all claims, demands, actions, judgments, costs, expenses (including, without limitation, reasonable counsel fees) and liabilities of every name and nature which may or result directly or indirectly from or by reason of any such loss, injury or damage or from or by reason of the failure of the City fully to keep, perform, observe and fulfill any of the covenants, conditions or restrictions herein …." *Id*. at pp. 2-3.

94.     The City also agreed to "release, indemnify and save harmless" Crouse-Hinds under other contractual agreements, such as the August 12, 1968 Indenture.

95.     Cooper has suffered loss of property and injury or damage to its property arising or resulting directly or indirectly, in whole or in part, from the City's use of the South Landfill Site.

96.     The City has failed to fully keep, perform, observe and fulfill its respective covenants, conditions and/or restrictions under the 1960 Indenture and other contracts, and these failures constitute continuing material breaches of the such contracts.

97.     As a result of the City's use of the South Landfill Site and its continuing material breaches of the 1960 Indenture and other contracts, Cooper has suffered loss, injury and damage, and incurred claims, demands, actions, judgments, costs, expenses (including, without limitation, reasonable counsel fees) and liabilities.

98.     The City has failed to indemnify and save Cooper harmless from and against all such loss, injury, damage, claims, demands, actions, judgments, costs, expenses (including, without limitation, reasonable counsel fees) and liabilities in accordance with its obligations under the 1960 Indenture and other contracts.

99.     As a result of the City's continuing material breaches of the 1960 Indenture and other contracts and the City's failure to indemnify and save Cooper harmless in accordance therewith, Cooper has suffered substantial damages, including but not limited to at least $11.9 million in response costs, reasonable counsel fees and other costs and expenses, and will continue to suffer additional such damages until the City meets all of its obligations under the 1960 Indenture and other contracts, including its obligations to indemnify and save Cooper harmless.

100.    Cooper's damages are directly and proximately caused by the City's continuing material breaches of the 1960 Indenture and other contracts.

101.    Accordingly, Cooper is entitled to an award of all compensatory damages arising out of the City's breaches of the 1960 Indenture and other contracts, including an award of Cooper's reasonable attorney fees resulting therefrom, a declaration that the City is liable for all future such damages arising therefrom (including reasonable attorney fees incurred by Cooper in this proceeding), and injunctive relief to compel the City's specific performance of all of its remaining obligations under the 1960 Indenture and other contracts, including its obligations to indemnify and save Cooper harmless.

## FIFTH CAUSE OF ACTION:
## BREACH OF CONTRACT AND CONTRACTUAL INDEMNITY
## AGAINST THE COUNTY

102.   The allegations made in paragraphs 1 through 101 are incorporated by reference as if set forth here in full.

103.   The August 30, 1972 Option Agreement is a valid and binding contract between Crouse-Hinds and the County of Onondaga which has never been terminated.

104.   Cooper has performed all of its obligations under the Option Agreement.

105.   Under the terms of the Option Agreement, the County agreed to "defend, save harmless and indemnify Crouse-Hinds from and against any and all claims against Crouse-Hinds and any and all loss, costs, damages or expenses (including without limitation reasonable counsel fees) which Crouse-Hinds may suffer, sustain, or incur by reason of … any damages to the real or personal property of Crouse-Hinds."  Ex. C, pp. 6-7.

106.   Moreover, the County agreed, *inter alia*, to "save harmless and indemnify" Cooper "whether or not the occurrence giving rise to such claims shall have been due to the negligent act or omission of the County or its contractors, agents or invitees."  *Id.*

107.   Cooper has suffered loss of property and injury or damage to its property arising out of the County's use of its property in a manner inconsistent with the Option Agreement.

108.   The County has failed to fully keep, perform, observe and fulfill its respective covenants, conditions and/or restrictions under the Option Agreement, and these failures constitute continuing material breaches of the Option Agreement.

109.   As a result of the County's disposal of contaminated dredged spoils on the Sites and its continuing material breaches of the Option Agreement, Cooper has suffered loss, costs, damages, and expenses (including without limitation reasonable counsel fees).

110.    The County has failed to indemnify and save Cooper harmless from and against all loss, costs, damages or expenses (including without limitation reasonable counsel fees) in accordance with its obligations under the Option Agreement.

111.    As a result of the County's continuing material breaches of the Option Agreement and the County's failure to indemnify and save Cooper harmless in accordance with the Option Agreement, Cooper has suffered substantial damages, including but not limited to approximately $11.9 million in response costs, reasonable counsel fees and other costs and expenses, and will continue to suffer additional such damages until the County meets all of its obligations under the Option Agreement, including its obligations to indemnify and save Cooper harmless.

112.    Cooper's damages are directly and proximately caused by the County's continuing material breaches of the Option Agreement.

113.    Accordingly, Cooper is entitled to an award of all compensatory damages arising out of the County's breaches of the Option Agreement, including an award of Cooper's reasonable attorney fees resulting therefrom, a declaration that the County is liable for all future such damages arising therefrom (including reasonable attorney fees incurred by Cooper in this proceeding), and injunctive relief to compel the County's specific performance of all of its remaining obligations under the Option Agreement, including its obligations to indemnify and save Cooper harmless.

## SIXTH CAUSE OF ACTION:
## CONTRIBUTION UNDER STATE SUPERFUND LAW

114.    The allegations made in paragraphs 1 through 113 are incorporated by reference as if set forth here in full.

115.    The wastes disposed of by Defendants at the Sites constituted or contained "hazardous waste" as defined in the State Superfund Law, N.Y. Envtl. Conserv. Law § 27-1301(1).

116.    The Defendants are "operators" and/or "persons who are responsible for disposal of hazardous wastes" at the Sites within the meaning of N.Y. Envtl. Conserv. Law § 27-1313(5)(f).

117.    Cooper has incurred and will continue to incur liability, investigation and remedial costs and other expenses due to hazardous wastes disposed of at the Sites for which Defendants are liable under N.Y. Envtl. Conserv. Law § 27-1313(5)(f).

118.    Section 1401 of New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 1401, provides, in relevant part, that "two or more persons who are subject to liability for damages for the same . . . injury to property . . . may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."

119.    Pursuant to N.Y. C.P.L.R. § 1401, Cooper is entitled to contribution from the Defendants for some or all of the liability, investigation and remedial costs, damages and other expenses it has incurred and will continue to incur due to hazardous wastes disposed of at the Sites, for which Defendants are responsible.

## SEVENTH CAUSE OF ACTION:
## STRICT LIABILITY UNDER NEW YORK SPILL ACT

120.    The allegations made in paragraphs 1 through 119 are incorporated by reference as if set forth here in full.

121.    Section 181(1) of the New York Spill Act, N.Y. Nav. Law § 12-181(1), provides that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault,

- 24 -

for all clean-up and removal costs and all direct and indirect damages, no matter by whom sustained …."

122.    The wastes dumped by Defendants at the Sites included or contained "petroleum" as defined by the Spill Act, N.Y. Nav. Law § 12-172(15).

123.    Section 172(8) of the Spill Act, N.Y. Nav. Law § 12-172(8), defines "discharge" to include "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said waters …."

124.    Consequently, upon information and belief, Defendants discharged petroleum at or from the Sites within the meaning of Section 181(1) of the Spill Act, N.Y. Nav. Law § 12-181(1).

125.    Section 181(5) of the Spill Act, N.Y. Nav. Law § 12-181(5), provides that "[a]ny claim by any injured person for the costs of clean-up and removal and direct and indirect damages based on the strict liability imposed by [Section 181 of the Act] may be brought directly against the person who has discharged the petroleum …."

126.    Cooper is an injured person under the Spill Act due to Defendants' discharges of petroleum at or from the Sites.  Consequently, Defendants are strictly liable to Cooper for the costs of clean-up and removal and for direct and indirect damages, including but not limited to reasonable counsel's fees, incurred by Cooper to date and to be incurred in the future as a result of Defendants' discharges at or from the Sites.

## EIGHTH CAUSE OF ACTION:
## CONTRIBUTION UNDER NEW YORK SPILL ACT

127.    The allegations made in paragraphs 1 through 126 are incorporated by reference as if set forth here in full.

128.     Section 176(8) of the Spill Act, N.Y. Nav. Law § 12-176(8), provides that "every person providing cleanup, [or] removal of discharge of petroleum … pursuant to this section shall be entitled to contribution from any other responsible party."

129.     Cooper is a "person" engaged in "cleanup and removal" of discharges of petroleum at or from the Sites as defined under N.Y. Nav. Law §§ 12-176(5) and 12-176(8).

130.     Upon information and belief, the City discharged petroleum at or from the Sites and therefore is a responsible party under Section 176(8) of the Spill Act.

131.     Upon information and belief, the County discharged petroleum at or from the Sites and therefore is a responsible party under Section 176(8) of the Spill Act.

132.     Consequently, pursuant to the Spill Act, N.Y. Nav. Law § 12-176(8), Cooper is entitled to contribution from the Defendants for some or all of the liability, cleanup costs, damages, or other costs or expenses, including but not limited to reasonable counsel's fees, which Cooper has incurred and will incur in the future relating to discharges of petroleum at or from the Sites for which Defendants are responsible.

### NINTH CAUSE OF ACTION:
### UNJUST ENRICHMENT

133.     The allegations made in paragraphs 1 through 132 are incorporated by reference as if set forth here in full.

134.     Cooper has incurred and will continue to incur costs in responding to the Defendants' disposals, releases, threatened releases and discharges of wastes, hazardous substances, hazardous wastes, petroleum, pollutants and/or contaminants at or from the Sites.

135.     Cooper's incurrence of such costs, for which Defendants have legal responsibility, has resulted in and will continue to result in an unjust benefit to the Defendants.

136.     Consequently, Defendants have been unjustly enriched at Cooper's expense.

137.    Equity and good conscience require that Defendants make restitution to Cooper for its past costs, and to pay all future costs, incurred or to be incurred in order to respond to the disposals, releases, threatened releases and discharges of wastes, hazardous substances, hazardous wastes, petroleum, pollutants and/or contaminants at or from the Sites by Defendants.

### PRAYER FOR RELIEF

**WHEREFORE,** Cooper respectfully requests:

(1)    Judgment against the Defendants on Cooper's claim for CERCLA cost recovery, awarding Cooper its response costs incurred to date, together with interest thereon, as well as Cooper's future response costs in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a);

(2)    Judgment against the Defendants on Cooper's claim for CERCLA contribution, awarding Cooper some or all of its response costs incurred to date, together with interest thereon, as well as some or all of the response costs to be incurred by Cooper in the future pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f);

(3)    Declaratory Judgment declaring that both Defendants are strictly liable, jointly and severally, to Cooper pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for Cooper's response costs incurred to date, together with interest thereon, and to be incurred by Cooper in the future;

(4)    Declaratory Judgment declaring that both Defendants are liable to Cooper for contribution pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f) for some or all of Cooper's response costs incurred to date, together with interest thereon, as well as some or all of the response costs to be incurred by Cooper in the future;

(5)     Declaratory Judgment declaring that both Defendants are liable to Cooper pursuant to New York Civil Practice and Law Rules, N.Y. C.P.L.R. § 3001, for damages incurred to date and to be incurred by Cooper in the future at or in connection with the Sites;

(6)     Judgment against the City on Cooper's claim for breach of contract and contractual indemnity:

(a)     awarding Cooper compensatory damages arising out of the City's breaches of the 1960 Indenture and other contracts, including an award of Cooper's reasonable attorney fees resulting therefrom,

(b)     declaring that the City is liable for all future such damages arising therefrom, and

(c)     enjoining the City's specific performance of all of its remaining obligations under the 1960 Indenture and other contracts, including its obligations to indemnify and save Cooper harmless;

(7)     Judgment against the County on Cooper's claim for breach of contract and contractual indemnity:

(a)     awarding Cooper compensatory damages arising out of the County's breaches of the Option Agreement, including an award of Cooper's reasonable attorney fees resulting therefrom,

(b)     declaring that the County is liable for all future such damages arising therefrom, and

(c)     enjoining the County's specific performance of all of its remaining obligations under the Option Agreement, including its obligations to indemnify and save Cooper harmless;

(8)     Judgment against the Defendants on Cooper's claim for contribution pursuant to the State Superfund Law, N.Y. Envtl. Conserv. Law §§ 17-1301 *et seq*., and N.Y. C.P.L.R. § 1401, awarding Cooper for some or all of the liability, investigation and remedial costs, damages and other expenses Cooper has incurred to date, together with interest thereon, and will continue to incur due to hazardous wastes disposed of at the Sites;

(9)     Judgment against the Defendants on Cooper's claim for strictly liability pursuant to Section 181(1) and (5) of the Spill Act, awarding Cooper the costs of clean-up and removal and its direct and indirect damages, including but not limited to reasonable counsel's fees, arising out of Defendants' discharges of petroleum at or from the Sites;

(10)    Judgment against the Defendants on Cooper's claim for contribution pursuant to Section 176(8) of the Spill Act, awarding Cooper some or all of the liability, cleanup costs, damages, or other costs or expenses, including but not limited to reasonable counsel's fees, which Cooper has incurred or will incur in the future, relating to discharges of petroleum at or from the Sites;

(11)    Judgment against the Defendants on Cooper's claim for unjust enrichment, awarding Cooper restitution for its past costs, and all future costs, incurred or to be incurred in order to respond to Defendants' disposals, releases, threatened releases and discharges of wastes, hazardous substances, hazardous wastes, petroleum, pollutants or contaminants at or from the Sites;

(12)    An award of prejudgment interest on all of Cooper's past costs and expenses;

(13)    An award of the costs of suit, including reasonable counsel's fees, expert fees, court costs and other expenses; and

(14)     Any other further and appropriate relief as the Court deems just and proper.


Dated:    October 4, 2016                         s/ Victor Genecin

                                                  Brian D. Starer (Bar No. 1491356)
                                                  Victor Genecin (Bar No. 519072)
                                                  Squire Patton Boggs (US) LLP
                                                  30 Rockefeller Plaza
                                                  New York, New York  10112
                                                  Tel:  (212) 242-7480
                                                  Fax:  (212) 872-9841
                                                  Email: brian.starer@squirepb.com

                                                  *Attorneys for Plaintiff Cooper Crouse-Hinds, LLC*