**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**COOPER CROUSE-HINDS, LLC, COOPER**
**INDUSTRIES, LLC,**

                                        **Plaintiffs,**

        **vs.**
                                                                **5:16-cv-1201**
                                                                **(MAD/ATB)**

**CITY OF SYRACUSE, NEW YORK, COUNTY OF**
**ONONDAGA, NEW YORK,**

                                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**SQUIRE PATTON BOGGS LLP**              **BRIAN D. STARER, ESQ.**
1211 Avenue of the Americas, 26th Floor   **VICTOR GENECIN, ESQ.**
New York, New York 10112
Attorneys for Plaintiffs

**SQUIRE PATTON BOGGS LLP**              **D. REES ALEXANDER, ESQ.**
41 S. High Street, Suite 2000             **DANELLE M. GAGLIARDI, ESQ.**
Columbus, Ohio 43215                      **REBEKAH M. SINGH, ESQ.**
Attorneys for Plaintiffs                  **VINCENT ATRIANO, ESQ.**

**HANCOCK ESTABROOK, LLP**              **JOHN G. POWERS, ESQ.**
1800 AXA Tower I                          **MARY L. D'AGOSTINO, ESQ.**
100 Madison Street
Syracuse, New York 13202
Attorneys for Defendant City of Syracuse

**CITY OF SYRACUSE**                    **TODD M. LONG, ESQ.**
**LAW DEPARTMENT**
233 East Washington Street
300 City Hall
Syracuse, New York 13202
Attorneys for Defendant City of Syracuse

**ONONDAGA COUNTY**                    **BENJAMIN M. YAUS, ESQ.**
**DEPARTMENT OF LAW**
John H. Mulroy Civic Center

421 Montgomery Street, 10th Floor
Syracuse, New York 13202
Attorneys for Defendant Onondaga County

**THE WLADIS LAW FIRM, PC**          **KEVIN C. MURPHY, ESQ.**
6312 Fly Road
East Syracuse, New York 13057
Attorneys for Defendant Onondaga County

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiffs Cooper Crouse- Hinds and Cooper Industries initiated this action on October 4, 2016, against Defendants City of Syracuse and County of Onondaga.  *See* Dkt. No. 1.  Following a motion to dismiss, Plaintiffs' claims pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and a contract indemnification agreement survive. *See* Dkt. No. 58.  Now before this Court are Defendant County's and Defendant City's motions for summary judgment, Defendant County's and Defendant City's motions *in limine* to preclude expert reports and opinions, and Plaintiffs' motion for summary judgment.

### II. BACKGROUND

**A.**    **Plaintiffs' Corporate History**

In approximately 1911, the Crouse Hinds Company constructed a manufacturing facility at the intersection of Seventh North Street and Wolf Street in Syracuse, New York.  *See* Dkt. No. 160-2 at ¶ 7.  Crouse Hinds Company was subsequently acquired by Cooper Industries, Inc., in 1981, and then merged into Plaintiff Cooper Industries, LLC ("CI") on January 1, 2005.  *See* Dkt. Nos. 143-7; 143-11.  The manufacturing facility was operated by Plaintiff CI, or its corporate predecessors, between 1912 and 2004.  *See* Dkt. No. 151-6 at 5.

Plaintiff Cooper-Crouse-Hinds, LLC ("CCH"), was formed on August 12, 2004.  *See* Dkt. No. 143-9.  On September 1, 2004, Cooper Industries, Inc. transferred specified assets to Plaintiff CCH, including the manufacturing facility.  *See* Dkt. No. 143-8.  Between 2004 and the present, Plaintiff CCH has operated the manufacturing facility.  *See* Dkt. No. 161-2 at ¶ 10.

The manufacturing facility utilized foundry and machining operations to cast, machine, finish, and assemble electrical fittings, enclosures, panel boards, switches, traffic signals, and lighting.  *See* Dkt. No. 151-6 at 5.  The manufacturing facility generated, handled, transported treated, stored, or disposed of hazardous substances at various times during its operations.  *See* Dkt. No. 161-2 at ¶ 11.

Between 1911 and 1948, Crouse Hinds acquired parcels of land located on both sides of Seventh North Street.  *See* Dkt. No. 160-2 at ¶ 17.  The parcels to the southwest are located in the City of Syracuse and are known as the South Landfill.  *Id*. at ¶ 18.  The parcels to the northeast are located in the Town of Salina, New York and are known as the North Landfill.  *Id*. at ¶ 19.  In 1965, Crouse-Hinds transferred a portion of the North Landfill that is adjacent to Ley Creek to East Plaza, Inc.  *Id.* at ¶ 20.  In 1973, another portion of the North Landfill was transferred to Defendant County pursuant to a 1972 option agreement, which the County subsequently transferred to East Plaza in 1973.  *Id.* at ¶¶ 21-22.  In 2016, the North and South Landfills were transferred from Plaintiff CI to Plaintiff CCH.  *Id*. at ¶ 25.

**B.       Contamination at the Site**

Both the North and the South Landfills are "impacted by SVOCs[1], PCBs and metals at concentrations in excess of" NYSDEC Table 375-6.8(b), which sets forth the soil cleanup

---

[1] Semi volatile organic compounds.

3

objectives in restricted industrial use.  *See* Dkt. No. 144-18 at 11.  The parties dispute the source of the contamination.

### 1. Plaintiffs' use of PCBs

Plaintiffs admit that they disposed of waste on the landfills and that, at times, the production process used PCBs.  Reports from 1961, 1963, and 1965 documented the discharge of liquid waste containing toxic contaminants including cyanides, and compounds of copper, cadmium, zinc, and aluminum in the South Landfill.  *See* Dkt. No. 160-2 at ¶¶ 27-30.  Plaintiffs also disposed of solid waste containing foundry mold sand, core sand, wood, paper, cardboard, fly ash, scrap steel drums, scrap rods and nails, steel shot, floor sweepings, speedi-dry, paint scrapings, garbage, and construction demolition materials in the South Landfill.  *Id*. at ¶ 31.

On the North Landfill, from 1972-1980, Crouse-Hinds disposed of industrial waste including foundry sand, floor sweepings, core butts, metal scrap, metal buffing and polish residue, scrap lumber, plastic waste, paper, and cardboard.  *Id*. at ¶ 38.  From 1980 to 1983, Crouse-Hinds disposed of approximately forty cubic yards per day of industrial waste.  *Id*. at ¶ 40.  In 2012, a drum containing PCB capacitors was unearthed in the North Landfill.  *Id*. at ¶ 49.

The parties dispute the specifics of Plaintiffs' waste disposal practices, including the extent of PCB use and disposal.  Undisputed here, and sufficient for the purposes of the pending motions, is that Plaintiffs in the 1980s used at least twenty-four PCB Transformers and ninety-nine PCB capacitors.  *See* Dkt. No. 145-40 at 8-12.  And in 1981, Plaintiff CI purchased 1,440 pounds of PCBs.  Dkt. No. 160-2 at ¶ 173.  A 1983 audit revealed thirty-eight PCB leaks and "Speedi-dri" was used to clean-up a spill in 1986.  *See id.* at ¶¶ 176, 178.  Plaintiffs, however, contend that at least some of the PCBs on the North and South Landfills are attributable to Defendants.

### 2. *Defendant County's Excavation of Ley Creek*

Defendant County, beginning in 1970, excavated sediment from Ley Creek to increase the creek's capacity and lessen on-going flooding. *Id.* at ¶ 124. For approximately, forty years, however, General Motors Corporation discharged PCBs from its Inland Fisher Guide facility into Ley Creek. *See* Dkt. No. 175 at ¶ 217. A 2010 letter from the County stated "[t]he evidence here is undisputed that PCBs were released (and continue to be released) into Ley Creek from [General Motors] and they are transported the length of Ley Creek to its point of discharge into Onondaga Lake. Thus, by definition, the Site is the entirety of Ley Creek[.]" *See* Dkt. No. 164-11 at 8.

A series of newspaper articles in the 1960s confirms the existence of pollution and odor in Ley Creek at that time. *See* Dkt. Nos. 164-2, 164-3, 164-4, 164-6. In 1986 and 1987, sampling of a well in an area where spoils were placed, on the Factory Avenue bank, revealed concentrations of PCBs up to 446.7 ppm. *See* Dkt. No. 164-7. Moreover, a 1989 report issued by the County advises citizens "to avoid Ley Creek and contact with the dredge spoils that may have been deposited along the creek banks." Dkt. No. 164-8 at 5.

The parties dispute whether excavated spoils were placed on the North Landfill.[2] Defendant County points to the lack of explicit documentation of their deposit on the North Landfill, as well as a contract drawing which directed the placement of spoils and did not include placement on the North Landfill. *See* Dkt. No. 143-2 at 25. Plaintiffs, on the other hand, point to an ambiguous drawing and aerial photographs. *See* Dkt. No. 145-18; Dkt. No. 150-11.

### 3. *Defendant City's Municipal Waste*

---

[2] Although the parties disagree on the extent of dredged spoils placed on the South Landfill, Defendant County acknowledges that at least some dredged spoils were placed there. *See* Dkt. No. 160-2 at ¶ 156; Dkt. No. 175 at ¶ 233.

5

Defendant City operated a municipal landfill for the deposit of household garbage and trash at the South Landfill from 1960 to 1965.  Dkt. No. 144-17 at 2.  Defendant City disposed of approximately 2,000 cubic yards of municipal waste per week during this time.  *Id.*

However, Defendant City's operations on the North Landfill, if any, are contested. Defendant City did not use the North Landfill for municipal waste, but did use the East Plaza, adjacent to the North Landfill, from 1968 to 1972.  Plaintiffs allege that they have found various municipal waste on the North Landfill, and that therefore the Defendant City engaged in unauthorized waste disposal.

## C.    Administrative Orders with NYSDEC

In 1985, the New York State Department of Environmental Conservation ("NYSDEC") designated the site as a Class 2 Inactive Hazardous Waste Disposal Site under the State Superfund Program.  *See* Dkt. No. 26 at ¶ 47; Dkt. No. 144-15.  In 2004, NYSDEC entered into a consent order with Cooper Industries, Inc.  Dkt. No. 160-2 at ¶ 52.  The 2004 Consent Order required Plaintiff CI to develop a remedial investigation, perform interim remedial measures, and reimburse NYSDEC for administrative costs related to the agreement.  *Id.* at ¶ 53.  Pursuant to the 2004 Consent Order, a Remedial Investigation Report was submitted to NYSDEC by Plaintiff CI in 2009.  Dkt. No. 144-18.  The Remedial Investigation Report summarizes the contamination at the site.

On March 31, 2011, NYSDEC issued a Record of Decision ("ROD"), which details selected remedies for the site.  On August 29, 2011, Plaintiff CCH entered into a Remedial Design/Remedial Action Order on Consent and Administrative Settlement with NYSDEC.  Dkt. No. 160-2 at ¶ 61.  The 2011 Order sets forth the procedures for the parties to develop and implement the ROD.  *See* Dkt. No. 144-17.  The final remedial design was submitted in February

2014.  *See* Dkt. Nos. 152-11, 152-12.  On July 19, 2019, Plaintiffs completed their response actions and received a certificate of completion from NYSDEC.  *See* Dkt. No. 144-21.

**D.   Plaintiffs' Response Measures**

Pursuant to their consent orders with NYSDEC, Plaintiffs implemented response measures on the North and South Landfills beginning in 2004.  Relevant here for statute of limitations purposes, Plaintiffs constructed monitoring wells in 2005, a perimeter fence in 2007, and check dams in 2006 and 2010.

On November 2 and 3, 2005, Plaintiffs installed four observation wells.  Dkt. No. 160-2 at ¶ 81.  The purpose of the observation wells was "to determine the source and extent of free floating product" that had been observed in the well.  *Id.* at ¶ 80.  The 2009 remedial investigation report states this interim remedial measure "serves to monitor petroleum accumulation in the well and to remove any buildup of petroleum and it also effectively limits the potential for migration of any petroleum away from the well, thus reducing the potential for groundwater impacts down-gradient of the well."  Dkt. No. 144-18 at 9.

The 2009 remedial investigation report also states that a security fence was installed along the boundaries of the North and South Landfills in December 2007.  *Id.* at 9-10.  An eight-foot chain link fence covered by nine-gauge industrial fabric was installed by Atlas Fence, a fencing subcontractor.  Dkt. No. 153-3.  The remedial investigation report states the purpose of the perimeter fence was to "eliminate or severely restrict access" and "reduce the risks and potential exposure related to unauthorized access."  Dkt. No. 144-18 at 9-10.

Next, multiple check dams were installed.  A July 18, 2007 report filed with NYSDEC stated that two check dams, one twenty-feet wide and six-feet tall, and the other forty-feet wide and six-feet tall, were installed on the North Landfill in December 2006.  Dkt. No. 144-31 at 2.  A

March 2010 progress report filed with NYSDEC states that a "silt fence/hay bale check dam" was completed on March 1, 2010.  Dkt. No. 153-5 at 2.  Additionally, a November 2010 progress report states that the condition of two check dams were observed, and they were substantially similar to their "post-construction conditions seen in photos taken by others earlier in 2010."  Dkt. No. 153-6 at 3.

## E.    Procedural Posture

On March 12, 2021, Defendant County moved for summary judgment on Plaintiff CCH's claim pursuant to Section 113(f)(3)(B),[3] Plaintiff CI's claim pursuant to Section 107(a), Plaintiffs' request for declaratory relief, Plaintiff CI's contract indemnification claim, co-Defendant City's cross claim, and for their counter claim for liability against Plaintiff CCH for CERCLA liability. Defendant County also filed a motion *in limine* to preclude Plaintiffs' expert's opinions.  On March 13, 2021, Defendant City similarly moved for summary judgment on Plaintiff CCH's and CI's Section 113(f)(3)(B) and Section 107(a) claims, respectively.  Defendant City also filed a motion *in limine* to preclude Plaintiffs' expert's opinions.

On April 23, 2021, Plaintiffs filed an opposition to Defendants' motions and cross-moved for summary judgment.  Dkt. Nos. 160, 161.  Plaintiff CI seeks summary judgment for liability on its Section 107(a) claim and Plaintiff CCH seeks summary judgment for liability on its Section 113(f)(3)(B) claim.

### III. MOTIONS *IN LIMINE* TO PRECLUDE EXPERT OPINION

## A.    Standard of Review

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence.  *See Luce v. United States*, 469 U.S. 38, 40 n.2

---

[3] Plaintiff CCH has voluntarily dismissed its Section 107 claim.  Dkt. No. 161-1 at 32 n.13.

(1984); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  A court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds.  *See Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94–CV–5220, 1998 WL 665138, *3 (S.D.N.Y. Sept. 25, 1998).  Courts considering a motion *in limine* may reserve decision until trial so that the motion is placed in the appropriate factual context.  *See Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).  Alternatively, the court is "free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling" at trial as "the case unfolds, particularly if the actual testimony differs from what was contained in the [movant's] proffer."  *Luce*, 469 U.S. at 41–42.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  That Rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).  The rule set forth in *Daubert* applies to

scientific knowledge, as well as technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265-66 (internal alterations, quotations, and citations omitted). The Court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education ... [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district

10

court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267.  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.*  "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (quotation and other citation omitted).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F.Supp.2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'"  *Melini v. 71st Lexington Corp.*, No. 07-CV-701, 2009 WL 413608, *5 (S.D.N.Y. Feb., 3, 2009) (quoting *Amorgianos*, 303 F.3d at 267).

**B.     Whether Plaintiffs' Experts Considered the Relevant Evidence**

Defendant County asserts that Plaintiffs' experts did not consider certain relevant evidence in reaching their opinions, the opinions are therefore unreliable, not relevant, speculative, or conjectural, and the opinions should be precluded.  *See* Dkt. No. 147 at 2.  Defendant County objects to expert opinion which it claims does not sufficiently weigh evidence regarding Plaintiffs' own use of PCBs, placement of Ley Creek spoils on the North Landfill, PCB hotspots on the North Landfill, and the contamination of Ley Creek.

A trial court should reject the admissibility of expert opinion that is "is speculative or conjectural, ... or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison …. [O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted).  Frequently, "'gaps or inconsistencies in the reasoning leading to [the expert's] opinion ... go to the weight of the evidence, not to its admissibility.'"  *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)).

Defendant County's objection that Plaintiffs' experts failed to consider Plaintiffs' own PCB use in its manufacturing process goes to the weight of the evidence, not its admissibility.  *See, e.g.*, *GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 342 (N.D.N.Y. 2013); *Argonaut Ins. Co. v. Samsung Heavy Indus. Co.*, 929 F. Supp. 2d 159, 167 (N.D.N.Y. 2013).  A contention that an expert did not weigh a certain piece of evidence adequately does not take an expert opinion into the realm of "speculative or conjectural." *Boucher*, 73 F.3d at 21.  Rather, the method to contest the factual underpinning of expert opinion is "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Atl. Specialty Ins. Co. v. Gold Coast Dev., Inc.*, No. 05–CV–4863, 2008 WL 974411, *9 (E.D.N.Y. Apr. 8, 2008) (citing *Daubert*, 509 U.S. at 596 (citations and quotations omitted)).

Plaintiffs' experts based their conclusions on a reliable foundation.  At most, Defendant County's objection is that Plaintiffs' experts would have been more reliable if they considered other documents.  Defendant County does not object to the "intellectual rigor" used by Plaintiffs'

experts or the reliability of the underlying documents they used.  *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 145 (S.D.N.Y. 2003).  Plaintiffs' experts were not required to fully explore every possible alternative:

> Here, Defendant points out that there is another explanation available for why the lock pawl was not in place at the time of the accident besides a manufacturing defect.  Defendant's expert report surely offers this explanation.  To be admissible, however, Plaintiff's expert report need not accept this scenario.  The Court notes that Defendant's expert report likewise builds upon physical evidence, testimony and reported use to reach the conclusion that the lock pawl was removed after shipment to the consumer.

*Boots v. Stanley Black & Decker, Inc.*, 132 F. Supp. 3d 307, 317 (N.D.N.Y. 2015).

Defendant County's argument, therefore, goes to the weight of the opinions, not the admissibility.  Defendant County's objection is best explored through cross-examination.  Accordingly, Defendant County's request that Blasting Opinion 1, Noel Opinion 4, Ijaz Manufacturing Operations Opinion 1, Ijaz Landfill Operations Opinion 1, and Ijaz Landfill Investigation Opinions 1 and 3, and Defendant City's request that Noel Opinion 4 be precluded is denied.

For identical reasons, the Court also rejects the remainder of Defendant County's motion *in limine* challenging Plaintiffs' experts' failure to weigh certain documents.  Therefore, Defendant County's request to preclude Blasting Opinion 3 as to the North Landfill, Campbell Opinion 2 as to the North Landfill, and Noel Opinion 1 as to the North Landfill and erosional transport are denied.  Defendant County argues that their conclusion that contaminated Ley Creek spoils were placed on the North Landfill is incorrect.  Defendant County offers an alternate theory based on documents that it believes Plaintiffs' experts did not give adequate weight.  Defendant County does not take issue with the Plaintiffs' experts' qualifications or methodologies, only their failure

to weigh certain documents more heavily.  As addressed above, a motion *in limine* is not the proper procedure to express its disagreement.

Additionally, Defendant County's request to preclude Blasting Opinion 4, Campbell Opinion 6, Noel Opinion 1, and Ijaz Landfill Investigation 2 is denied.  Again, Defendant County contends that certain documents contradict these opinions.  Plaintiffs' experts' opinions, however, "build[] upon physical evidence," and the review of historical documentation.  *Boots*, 132 F. Supp. 3d at 317.  Defendant County merely suggests that certain documents can be interpreted differently.  That is not a proper objection to the admissibility of expert opinion.

Lastly, and similarly, Defendant County moves to preclude Blasting Opinion 3, Campbell Opinion 2, and Noel Opinion 1, regarding the contamination of Ley Creek at the time it was dredged.  Defendant County simply disagrees with Plaintiffs' experts' conclusions.  Regardless of the merits of the disagreement, these opinions are admissible.  Plaintiffs' experts' opinions that Ley Creek contained contaminated spoils at the time it was dredged is based on a strong factual backing and Defendant County does not challenge any of the methodologies used.  Defendant County's motion *in limine* is therefore denied.

## C.    Whether Plaintiffs' Experts are Needlessly Duplicative

Federal Rule of Evidence 403 allows a Court to exclude relevant evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Defendant City argues that Plaintiffs' experts provide needlessly duplicative testimony in their reports.

At the summary judgment stage, the Court does not find the probative value of Plaintiffs' experts to be substantially outweighed by any of the Rule 403 factors.  There is no jury to

prejudice or mislead, and less concern of undue delay, at this stage. *Whitford v. Nichol*, 180 F.

Supp. 3d 583, 586 (W.D. Wis. 2016) ("[W]here the factfinder and the gatekeeper are the same,

the court does not err in admitting the [expert] evidence subject to the ability later to exclude it or

disregard it if it turns out not to meet the standard of reliability established by Rule 702");

*The Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1979360, *5 (N.D. Ill. May 15,

2014). Moreover, regardless of whether Plaintiffs' experts' reports are unnecessarily duplicative,

it is premature to limit their testimony before the issues a factfinder will be required to decide are

determined.

Accordingly, the Court finds that it is premature to rule whether Plaintiffs' experts present

needlessly duplicative testimony. The Court will evaluate whether expert testimony should be

excluded because it is cumulative at the time of trial.

**D.     Lack of Specificity**

Defendant City further moves to preclude Plaintiffs' experts' opinions because, it alleges,

the opinions are acting as a conduit for other opinions, interpreting historical documents, and

outside the scope of the experts' expertise. Defendant City, however, fails to make its objections

with the specificity required for the Court to determine whether the motion is meritorious. *See,*

*e.g.*, *Wechsler*, 381 F. Supp. 2d at 150 (denying motion *in limine* because "[d]efendants do not

specify any evidence that they seek to preclude"); *Kaufman v. Columbia Mem'l Hosp.*, No. 1:11-

CV-667, 2014 WL 3888229, *5 (N.D.N.Y. Aug. 7, 2014) ("However, it is nearly impossible for

the Court to rule on Defendant's motion *in limine* due to the lack of specificity in Defendant's

motion").

Defendant City does not direct the Court to which opinions it believes should be precluded. The Court declines to excavate the relevant expert opinions from the expansive record. The Court reserves judgment on the admissibility of expert opinion on these grounds.

## IV. MOTIONS FOR SUMMARY JUDGMENT

**A.      Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citations omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

The Second Circuit "recognize[s] in CERCLA's context that summary judgment is a 'powerful legal tool[ ]' that can 'avoid lengthy and perhaps needless litigation.'" *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 521 (2d Cir. 1996) (quoting *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993)).  Courts adjudicate motions for summary judgment in the CERCLA context under the same standard as in any other case. *Id.*

## B.    CERCLA Overview

Enacted in 1980 in response to New York's Love Canal Disaster,[4] CERCLA "is a remedial statute 'designed to encourage prompt and effective cleanup of hazardous waste sites' by 'assuring that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.'"  *MPM Silicones, LLC v. Union Carbide Corp.*, 931 F. Supp. 2d 387, 392-93 (N.D.N.Y. 2013) (quoting *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010)).  "In furtherance of these purposes, the statute imposes strict liability on owners and facility operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site." *Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 79-80 (2d Cir. 2014).

Under CERCLA, states and the federal government may "initiate comprehensive cleanups and ... seek recovery of expenses associated with those cleanups" from property owners, who are strictly liable for the hazardous materials on their property.  *Niagara Mohawk Power Corp.*, 596 F.3d at 120.  To relieve the burden on property owners, CERCLA permits them to "seek

---

[4] After serving as a dumping ground for toxic waste, a canal was filled and sold to the city of Niagara Falls and used as the site as an elementary school and playground.  Decades later state and federal government investigations revealed that the toxic waste had caused pervasive health problems, leading then-President Carter to declare a federal emergency.  *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 n.5 (2d Cir. 2010) (citing Michael H. Brown, Love Canal and the Poisoning of America, ATLANTIC MONTHLY, Dec. 1979, at 33).

reimbursement of their cleanup costs from others in the chain of title or from certain polluters—the so-called potentially responsible parties ('PRPs')." *Id.* (citing (42 U.S.C. § 9607(a)).  That recourse is available through three separate provisions in CERCLA: Sections 107(a), 113(f)(1), and 113(f)(3)(B).  *See id.*

Section 107(a) authorizes parties—including the United States, a state, or a PRP—to seek reimbursement for costs incurred remediating pollution at a property.  *See* 42 U.S.C. § 9607(a)(4).  Section 113(f)(3)(B), on the other hand, "provides a right of contribution to PRPs that have settled their CERCLA liability with a state or the United States through either an administrative or judicially approved settlement." *Id.* (citing 42 U.S.C. § 9613(f)(3)(B)).  Finally, Section 113(f)(1) provides a right of contribution to PRPs that have been sued under Sections 106 or 107.  *See* 42 U.S.C. § 9613(f)(1).  Additionally, Section 113(g)(2) permits a party to seek a declaratory judgment on a potentially responsible party's liability for any necessary future response costs.  42 U.S.C. § 9613(g)(2).

Courts "generally bifurcate a CERCLA proceeding, determining liability in Phase I, and then apportioning recovery in Phase II." *Niagara Mohawk Power Corp.*, 596 F.3d at 131.  Here, Plaintiffs have moved for summary judgment on the issue of liability.

To establish a *prima facie* case of liability, a plaintiff must show that (1) the defendant fits one of the four classes of responsible parties outlined in Section 9607(a); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under the Act.  *Price Trucking Corp.*, 748 F.3d at 80; *B.F. Goodrich Co.*, 958 F.2d at 1198.  The four classes of responsible parties are:

       (1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a)(1)-(4).

Noticeably absent from the *prima facie* case and responsible party definitions is the notion of causation. *Niagara Mohawk Power Corp.*, 596 F.3d at 131 ("The traditional tort concept of causation plays little or no role in the liability scheme. A party seeking to establish liability under CERCLA need not even show a specific PRP's waste caused cleanup costs"). The liability inquiry is therefore "very limited." *Alcan Aluminum*, 990 F.2d at 720. "CERCLA thus relaxes but does not eliminate the causation requirement: a plaintiff need not show a causal link between that particular waste and the response costs the plaintiff incurred, but it must demonstrate that a defendant deposited hazardous waste at the site in question." *DVL, Inc. v. Gen. Elec. Co.*, 811 F. Supp. 2d 579, 594 (N.D.N.Y. 2010) (internal quotation marks omitted).

When determining CERCLA liability, "there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain." *Niagara Mohawk Power Corp.*, 596 F.3d at 131 (quoting *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534,

547 (6th Cir. 2001)).  Thus, "CERCLA liability may be inferred from the totality of the circumstances as opposed to direct evidence." *Id.* at 136; *see also DVL, Inc.*, 811 F. Supp. 2d at 594.  "[T]he party seeking contribution need not establish the precise amount of hazardous material discharged or prove with certainty that a PRP defendant discharged the hazardous material to get their CERCLA claims past the summary judgment stage." *Niagara Mohawk Power Corp.*, 596 F.3d at 132.  "Defenses of minimal involvement or limited proof of responsibility do have a role in the CERCLA scheme; they come in to play during the damages phase when the court is charged with equitably apportioning the costs of the cleanup among the PRPs." *Id.*

Defendants' motions for summary judgment raise numerous arguments.  Defendants argue that Plaintiff CI initiated its suit after the statute of limitations expired and that it was required to sue under Section 113(f)(3)(B), not Section 107(a).  Defendants also contend that Plaintiff CCH did not incur costs responding to the release or threatened release.  Next, Defendants argue they are not cover parties under CERCLA.  Plaintiff CI moves for summary judgment for liability on its Section 107(a) claim and Plaintiff CCH similarly moves for summary judgment for liability on its Section 113(f)(3)(B) claim.

**C.    Whether Plaintiff CI's Section 107(a) Action is Timely**

The statute of limitations for a claim under Section 107(a) differs depending on whether the corrective action taken was a removal action or remedial action.  If it is a removal action, a suit must be brought within three years after its completion.  42 U.S.C. § 9613(g)(2)(A).  If it is a remedial action, a suit must be brought within six years after its initiation.  42 U.S.C. § 9613(g)(2)(B).

Defendants argue that the construction of a perimeter fence, check dams, and an observation well were each a remedial action which triggered the accrual of a six-year statute of limitations upon the initiation of their construction.  Plaintiffs, in turn, argue each of these was a removal action, which statute of limitations does not accrue until the completion of the removal.

The statute defines "remove" or "removal" as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [ ] in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

The statute provides several examples of "removal" actions such as, "security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for." 42 U.S.C. § 9601(23).

The statute defines "remedy" or "remedial action" as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

The statute also provides examples of "remedial action[s]," including:

> Such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure

21

> that such actions protect the public health and welfare and the
> environment.  The term [also] includes the costs of permanent
> relocation of residents and businesses and community facilities
> [where] such relocation is more cost-effective [than other remedial
> action] … [and also] includes offsite transport and offsite storage,
> treatment, destruction, or secure disposition of hazardous
> substances and associated contaminated materials.

*Id.* § 9601(24).

Recently, in *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200 (2d Cir. 2020), the Second Circuit elucidated the difference between removal and remedial actions.  "The key distinction between the two terms is immediacy and comprehensiveness." *Id.* at 219.  Removal actions are "clean-up measures taken in response to immediate threats to public health and safety." *N.Y. State Elec. Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 230-31 (2d Cir. 2014). They are "often planned and executed relatively quickly in order to immediately abate public health hazards, such as contaminated drinking water." *MPM Silicones*, 966 F.3d at 220.

"Remediations, by contrast, include only actions 'consistent with [a] permanent remedy.'" *Id.* (quoting 42 U.S.C. § 9601(24)).  Unlike removals, remediations are often undertaken to "permanently remediate contamination" and "address 'the underlying source of contamination.'" *Id.* (quoting *NYSEG*, 766 F.3d at 223).

### 1. Perimeter Fence

Defendants argue that the 2007 construction of a perimeter fence was a remedial action, triggering the accrual of the six-year statute of limitations upon the initiation of its construction and rendering this suit untimely.  Plaintiffs argue that its construction was a removal action and that this suit is therefore timely.

The definition of "removal" includes "security fencing or other measures to limit access." 42 U.S.C. § 9601(23).  Nonetheless, Defendants maintain that the construction of this fence was

remedial.  Defendants argue that *MPM Silicones* holds that the statutory examples do not control, and the purpose of the corrective action predominates in characterizing a corrective action as either removal or remedial.  Defendants assert that the factors considered by the Court in *MPM Silicones* weigh in favor of finding that the corrective action was remedial.

In *MPM Silicones*, the Second Circuit held that the construction of an earthen cap, diversion ditch, and interceptor trench were remedial actions.  In finding these corrective actions to be remedial, the court stated that "[t]he statutory definitions do not provide clear insight as to the boundary between removals and remediations."  *MPM Silicones*, 966 F.3d at 219.  The court recognized that the "definitions of each type of action overlap substantially."  *Id.*

The court gave three examples.  Drainage controls, such as "trenches," "ditches," and "clay cover" are listed in 42 U.S.C. § 9601(24) as remedial, but "drainage controls, for example run-off or run-on diversion" and "[c]aping of contaminated soils" are listed in 40 C.F.R. § 300.415(e) as examples of removal actions.  The provision of alternative water supplies to replace contaminated water is also given as an example in the statutory definitions of removal and remedial.  42 U.S.C. §§ 9601(23), (24); *see also California ex rel. California Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 667 (9th Cir. 2004).  Lastly, monitoring activities are also included in both statutory definitions.  *See Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1245 (10th Cir. 2003).  CERCLA defines removal to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," 42 U.S.C. § 9601(23), but also defines remedial action to include "any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment."  42 U.S.C. § 9601(24).

The corrective actions in *MPM Silicones* – the earthen cap, diversion ditch, and interceptor trench – were either within this definitional overlap, or not listed as an example at all.  As such, the Second Circuit found that because the corrective actions "were taken as steps to permanently prevent contaminants known to be buried … from migrating away from their source" and were not "efforts to deal with any imminent hazard or threat to public safety by neutralizing contamination at its endpoint," they were remedial in nature.  *MPM Silicones*, 966 F.3d at 222-23 (internal quotations omitted).

Here, there is no similar statutory confusion.  CERCLA clearly defines removal to include "security fencing or other measures to limit access[.]"  42 U.S.C. § 9601(23).  This definition does not overlap with the definition of remedial action, which includes "perimeter protection using dikes, trenches, or ditches[.]"  42 U.S.C. § 9601(24).  Instead, the contrast in examples evidences clear legislative instruction on which perimeter protection is removal and which is remedial.

"[T]he starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof."  *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 165 (2d Cir. 2014).  Perimeter fencing constructed to limit access, as is the case here, is defined as a removal action.  The Court cannot find that a perimeter fence erected to limit access does not fit into a statutory definition which includes "security fencing or other measures to limit access," and does not find *MPM Silicones* instructs the Court to do so.

CERCLA defines removals to include "such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health or welfare or to the environment" and included security fencing as an example.  Its definition of remedial action does not create any ambiguity.  Rather, Congress's intent is clear from the plain text of the statute: perimeter fencing to limit

access prevents, minimizes, or mitigates damages to the public health and environment, and as such its construction is a removal action.

### 2. Check Dams

The parties dispute whether the construction of check dams were removal or remedial actions. Defendant County argues that the 2006 construction of check dams was a remedial action. Defendant City argues that the 2010 construction of check dams was remedial. Plaintiffs, in turn, argue these were removal actions.

Unlike perimeter fencing, a check dam can be either a removal or remedial action. CERCLA defines removal to include "such actions as may be necessary [ ] in the event of the threat of release of hazardous substances into the environment[.]" 42 U.S.C. § 9601(23). CERCLA, however, also defines remedial action to include "actions consistent with permanent remedy taken … in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger[.]" 42 U.S.C. § 9601(24).

### a. 2006 Check Dam Construction

Defendant County believes the December 2006 construction of two check dams was a remedial action, and therefore begins the accrual of the statute of limitations upon their initiation. A July 18, 2007 report filed with NYSDEC stated that two check dams, one twenty-feet wide and six-feet tall, and the other forty-feet wide and six-feet tall, were installed on the North Landfill in December 2006. Dkt. No. 144-31 at 2. According to the letter, PCBs were identified throughout the wetland and stream on the eastern side of the North Landfill in 2005. *Id.* at 1. Accordingly, Plaintiffs decided to "implement an interim remedial measure ... [to] control, contain, and prevent migration of potentially PCB-impacted sediments from the eastern wetland area to downstream

locations." *Id.* Defendant County argues that the eventual incorporation of the check dams into the final remedy makes their initial installation remedial. Dkt. No. 173 at 16.

It is well-settled that immediate actions taken to prevent the migration of contamination downstream, rather than addressing the contamination comprehensively at its source, is a removal action. In *NYSEG*, the Second Circuit found that a corrective action pursuant to a consent order was more akin to a removal action than a remedial action because "[i]t was not designed to clean up contamination at the source." *NYSEG*, 766 F.3d at 233. Rather, the court held that, "measures taken to minimize and mitigate contamination, but not to permanently eliminate it, are properly classified as removal actions." *Id.* (citing *New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 127 (2d Cir. 2013)). Ultimately, the Second Circuit found the construction of "slurry walls" to prevent coal tar from further migrating into the river to be a removal action. *Id.*

Similarly, in *Next Millenium Realty*, the Second Circuit found measures to address water contamination at the endpoint, rather than permanently preventing the release of the hazardous substance, to be a removal action. *Next Millenium Realty*, 732 F.3d at 127. The court stated that "[r]emoval actions are clean-up or removal measures taken to respond to immediate threats to public health and safety." *Id.* at 124-25. Moreover, even though the corrective actions were later adopted as part of a permanent remedial solution, the court still found they constituted a removal. *Id.* at 128-29. Accordingly, the action taken to prevent the imminent migration of contamination was removal. *Id.* at 126.

The construction of the 2006 check dams was an immediate action taken to prevent the migration of contamination farther downstream and is, therefore, a removal action. The report to NYSDEC makes clear that PCBs were discovered in 2005 and June 2006, and Plaintiffs decided to implement an interim measure to stop the migration of contamination. Dkt. No. 144-31 at 1.

26

The action was taken before the remedial plan was established.  Plaintiffs sought to stop the migration of contaminated settlements farther downstream, not permanently fix the issues of contamination at their source.  Interim measures only seeking to prevent the further migration of contamination, without regard to comprehensive cleanup, were specifically held to be removal actions in *NYSEG* and *Next Millenium*.  The eventual incorporation of the removal activity into a remedial plan does not change this analysis.  *Next Millenium Realty*, 732 F.3d at 128 ("[E]ven though [the corrective actions] were ultimately adopted as part of a permanent remedial solution, they still constituted 'removal' actions at all times relevant to the statute of limitations question").

### *b. 2010 Check Dam Construction*

Defendant City directs the Court to two progress reports filed with NYSDEC by Plaintiff CI.  The first, a progress report for March 2010, states that a "silt fence/hay bale check dam" was completed on March 1, 2010.  Dkt. No. 153-5 at 2.  The second, a progress report for November 2010, states that the condition of two check dams were observed and they were substantially similar to their "post construction conditions seen in photos taken by others earlier in 2010."  Dkt. No. 153-6 at 3.  Defendant City argues that check dams installed in 2010 were constructed pursuant to the remedial design, not as immediate reaction to the threat of contamination, and are therefore a remedial action.  *See* Dkt. No. 155-11 at ¶¶ 45-47; Dkt. No. 152-12 at 50.

There is insufficient record evidence to grant a motion for summary judgment based on a finding that the 2010 check dams were remedial.  Defendant City relies on two progress reports that mention the construction of check dams in 2010, and then notes that the remedial design included check dams as part of the "erosion and sediment control measures."  As evidence that the 2010 check dams were permanent features of the remedial design, Defendant City cites the remedial design's specification for check dam construction.  *See* Dkt. No. 152-12 at 52.  The

March 2010 check dam, however, appears to be a different structure than the remedial design. The remedial design calls for a specific rock size and geotextile fabric, *see id.*, but the March 2010 check dams are referred to as a "hay bale check dam." Dkt. No. 153-5 at 2. Without any other link between the remedial design and the March 2010 progress report, other than the words "check dam," the Court cannot find that the hay bale check dam was constructed as part of the remedial design, given the facial discrepancy in the material used. Given such scant evidence about the March 2010 check dam, the Court declines to find it was a permanent fixture of the remedial design, as Defendant City requests. With no evidence about the purpose of its installation, specifications, or connection to the remedial design, the Court cannot find its construction to be a remedial action.

The November 2010 progress report, which states that two earlier constructed check dams were observed, presents an even more obvious problem. These could be the 2006 check dams, the March 2010 check dams, or constructed after October 6, 2010 and therefore within the statute of limitations period. A letter stating check dams were observed in November 2010 is insufficient to establish any necessary fact about the check dams to determine if their construction was a removal or remedial activity.

Defendants' motions for summary judgment that Plaintiff CI's Section 107(a) claim is barred by the statute of limitations because the construction of check dams initiated the accrual of the statute of limitations is therefore denied.

### 3. Monitoring Well

Defendant County argues the 2005 construction of the MW-6 observation wells was a remedial action, triggering the six-year statute of limitations upon the initiation of their construction. *See* Dkt. No. 143-2 at 22. In late 2005, Plaintiffs built six monitoring wells at the

North Landfill.  Dkt. No. 144-27 at 6.  In its preliminary site assessment, CI stated to NYSDEC that "[t]he observation wells and test pits were installed in the area surrounding monitoring well MW-6A in an effort to determine the source and extent of free phase floating product, which had been observed in this well during the 2004 PSA and previous site investigation activities."  *Id.*

The term "monitoring" is included in the definitions of both "removal" and "remedial" actions.  Removal includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," whereas remediation includes "any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment."  42 U.S.C. §§ 9601(23), (24).

Courts, however, regularly hold the installation of monitoring wells to be a removal action.  *See MPM Silicones,* 966 F.3d at 220 n.27 (citation omitted); *see also City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1245 (E.D. Wash. 2006) (holding that the installation of monitoring wells was a "removal" action because the "wells were installed so that the EPA could determine ... whether the plugging was effective in reducing the level of contamination in the water"); *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 927 (5th Cir. 2000) (holding that the construction of monitoring wells was removal because "no permanent remedy was in place for the Complex when G&M constructed and installed the wells"); *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1245 (10th Cir. 2003) ("[I]t is reasonable to characterize the installation of the monitoring wells as a 'removal' action").

Here, the 2005 construction of the monitoring wells was an immediate reaction to an imminent threat, taken years before the adoption of a remedial design.  The Court, therefore, finds the monitoring well to be a removal activity.

**D.      Whether CI Was Required to Sue Under Section 113**

Defendant County argues that Plaintiff CI was required to bring this action pursuant to Section 113(f)(3)(B).  Section 113(f)(3)(B) is the proper procedural mechanism for a "person who has resolved its liability to the United States or a state for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement."  42 U.S.C. § 9613(f)(3)(B).  Defendant County argues that the 2004 Consent Order resolved some of Plaintiffs' liability, and therefore this action must be maintained pursuant to Section 113(f)(3)(B).

Recently, the Supreme Court clarified the type of liability that must be resolved in order to maintain a Section 113(f)(3)(B) action.  The Supreme Court held that a contribution claim under Section 113(f)(3)(B) "requires resolution of a CERCLA-specific liability" and not "a broader array of settlements involving environmental liability."  *Territory of Guam v. United States*, — U.S. —, 141 S. Ct. 1608, 1611 (2021).  "The most natural reading of § 113(f)(3)(B) is that a party may seek contribution under CERCLA only after settling a CERCLA-specific liability."  *Id.* at 1615.

The 2004 Consent Order does not resolve CERCLA-specific liability, and Defendant County does not argue that it does.  As noted in this Court's order at the motion to dismiss stage, "Defendants do not cite to any language in the order resolving CI's liability; indeed, it appears that no such language exists. … [T]he 2004 Order specifically states, 'Nothing contained in this Order shall be construed as barring, diminishing, adjudicating, or in any way affecting any of the Department's rights.'"  Dkt. No. 58 at 12.

Because the 2004 Consent Order does not resolve CERCLA-specific liability, as required by *Guam*, 141 S. Ct. 1608, Defendant County's motion for summary judgment on this ground is denied.

**E.      Whether CCH Incurred Costs**

Defendants move for summary judgment against Plaintiff CCH because, they allege, Plaintiff CCH did not incur costs as required to establish the *prima facie* case of liability under CERCLA. *Price Trucking Corp.*, 748 F.3d at 80. Defendants argue that the evidence establishes that all response costs were paid by either Plaintiff CI or nonparties. Plaintiff CCH, however, argues that it incurred costs because it was legally obligated to pay response costs pursuant to the 2011 order, and that even if it did not transmit costs initially, it nonetheless "incurred" response costs because the costs were "allocated against the environmental remediation liabilities on CCH's books." Dkt. No. 165 at ¶ 7.

The term "incur" is not defined by CERCLA. Plaintiff CCH argues that it refers to liability, relying on *Town of New Windsor v. Tesa Tuck, Inc.*, 935 F. Supp. 317, 321 (S.D.N.Y. 1996). Plaintiff CCH argues that the 2011 order established its liability, and that costs paid by Plaintiff CI and other nonparties were then internally accounted for against this liability. Therefore, Plaintiff CCH suggests, it incurred costs. Dkt. No. 160-1 at 20-21.

Plaintiff CCH is correct that the relevant inquiry is "who assumed a legal obligation to pay." *Andres v. Town of Wheatfield*, No. 1:17-CV-00377, 2020 WL 7764833, *6 (W.D.N.Y. Dec. 30, 2020) (noting that "[a] party may be found to have incurred a cost without having actually paid for it and a finding that a cost has been incurred may be based upon an existing legal obligation"); *see also Tesa Tuck, Inc.*, 935 F. Supp. at 320-21 (S.D.N.Y. 1996); *Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 971 F. Supp. 2d 896, 909 (E.D. Mo. 2013) ("The term 'to incur' costs is not defined by CERCLA, but has been interpreted to reach beyond those who actually paid for response costs"). Plaintiff CCH, however, is incorrect that the 2011 order establishes a legal obligation to pay a response cost. Rather, the 2011 order establishes a "mere possibility, even the certainty, that an obligation to pay will arise in the future," which "does not

31

establish that a cost has been incurred." *Andres*, 2020 WL 7764833, at *6 (quoting *Trimble v.*

*Asarco, Inc.*, 232 F.3d 946,958 (8th Cir. 2000)); *see also Rolan v. Atlantic Richfield Company*,

No. 1:16-CV-267, 2019 WL 5429075, *6 (N.D. Ind. Oct. 22, 2019).  Instead, Plaintiff CCH must

demonstrate a legal obligation to pay a specific response cost.  *Wilson Rd. Dev. Corp.*, 971 F.

Supp. 2d at 910.  The Second Circuit, in fact, held that reimbursing the response costs of another

party to satisfy a settlement agreement, as Plaintiff CCH claims it did here, does not incur those

costs:

> Section 107 "permits a PRP to recover only the costs it has
> 'incurred' in cleaning up a site."  *Id.* at 2338 (citing 42 U.S.C. §
> 9607(a)(4)(B)). Section 107(a) "permits cost recovery (as distinct
> from contribution) by a private party that has itself incurred cleanup
> costs." [*Atl. Research*, 127 S.Ct. at 2336.]  A party who "pays to
> satisfy a settlement agreement or a court judgment," however, "does
> not incur its own costs of response.  Rather, it reimburses other
> parties for costs that those parties incurred." *Id.*; *see also Kotrous v.*
> *Goss–Jewett Co. of N. Cal.*, 523 F.3d 924, 934 (9th Cir. 2008) ("[A]
> PRP who has not been subject to a § 106 or a § 107 action ... is not
> entitled to seek contribution under § 113.  Instead, he should
> proceed under § 107 for cost recovery.").  Here, Grace seeks to
> recover costs for remediation it performed itself; it does not seek to
> recoup expenses incurred in satisfying a settlement agreement or a
> court judgment.  We conclude that Grace may seek recovery for
> incurred response costs under section 107(a).

*W.R. Grace & Co. v. Zotos Int'l*, 559 F.3d 85, 92-93 (2d Cir. 2009).  The Court, therefore,

disregards costs allocated against Plaintiff CCH's books.

The relevant inquiry is thus whether Plaintiff CCH had a legal obligation to pay a specific

response cost.  The Court finds at least one invoice directed to Plaintiff CCH by NYSDEC that it

had a legal obligation to pay.  Dkt. No. 145-4 at 13.  Plaintiff CCH has therefore incurred at least

$14,601.34 in response costs, which is sufficient to satisfy that prong of its *prima facie* case.  *Id.*

If this case proceeds to the damages phase, Plaintiff CCH will have the opportunity to prove the response costs it incurred.

**F.     Whether Defendants are Covered Parties**

As discussed above, a *prima facie* cause of action under CERCLA requires a plaintiff to establish that a defendant is a covered party, as outlined in Section 9607(a).  *See, e.g.*, *B.F. Goodrich Co.*, 958 F.2d at 1198.  Defendants assert that Plaintiffs' motion for summary judgment should be denied, and their motions for summary judgment granted, because Plaintiffs cannot establish that Defendants are a responsible party.

An entity is a covered party if it falls into any of the four categories provided for under the statute, namely:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ....

42 U.S.C. § 9607(a).  Plaintiffs assert that each Defendant is both an operator and arranger, the second and third categories.

### *1. The North and South Landfills Constitute a Single Facility*

Both Defendants argue that they are not arrangers or operators with respect to the North Landfill because no record evidence demonstrates their hazardous waste disposal at the North Landfill. Defendants' argument, however, presupposes that the North and South Landfills are separate CERCLA facilities. Liability attaches to an entire CERCLA site, it is "when damages are apportioned[] that the relative strength of the evidence of liability becomes a relevant factor." *Niagara Mohawk Power Corp*, 596 F.3d at 131. At the summary judgment stage, the Court is "engaged in a very limited liability inquiry." *Id.* Therefore, summary judgment for the North Landfill is only appropriate if it is its own CERCLA facility. If the landfills are a single facility, Defendants' disposal practices at the North Landfill – or lack thereof – are only relevant when damages are apportioned, not at the liability stage.

The Court finds that the North and South Landfills are a single facility. CERCLA provides an "extraordinarily broad" definition of "facility." *California Dep't of Toxic Substances Control et al. v. NL Indus.*, No. 2:20-CV-11293, 2021 WL 4434984, *7 (C.D. Cal. July 19, 2021); *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 480 F. Supp. 3d 430, 441 (E.D.N.Y. 2020) ("Courts have interpreted 'facility' broadly") (citations omitted). CERCLA defines "facility" as:

> The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

"A contaminated site that is or was managed as a whole constitutes a single facility for CERCLA purposes ... [and] a widely contaminated area should not unnaturally be divided into

multiple facilities in order to limit a party's liability." *MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-CV-1542, 2016 WL 3962630, *26 (N.D.N.Y. July 7, 2016), *vacated and remanded in part on other grounds*, 966 F.3d 200 (2d Cir. 2020).  "'The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination.'"  *Foster v. United States*, 130 F. Supp. 2d 68, 75 (D.D.C. 2001) (quoting *United States v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998); *see also New York v. Westwood-Squibb Pharm. Co.*, 138 F. Supp. 2d 372, 379 (W.D.N.Y. 2000) ("[T]his court refuses to divide a widely contaminated piece of property … into separate CERCLA facilities.").

Courts routinely look to whether the areas in question were jointly managed or operated. *United States v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000); *see also Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 419 (4th Cir. 1999) (holding that entire property was a single facility because it "was at all relevant times operated by a single party, and both the EPA and Axel itself treated the entire property as a single facility for CERCLA remediation purposes in the consent decree that they signed").  For example, in *MPM Silicones*, the District Court concluded that a landfill was part of the same facility as a nearby waste management site because it shared a common PCB contaminate and "the fact that the entire property has been operated by a single owner, weigh in favor of finding that there is a single facility." *MPM Silicones*, 2016 WL 3962630, at *27.

In comparison, courts have regularly held adjacent properties to be distinct facilities where the properties had different owners.  For example, in *Niagara Mohawk Power Corp. v. Consolidated Rail Corp.*, 291 F. Supp. 2d 105 (N.D.N.Y. 2003), *rev'd on other grounds Niagara Mohawk Power Corp.*, 596 F.3d 112, the court declined to hold that adjacent properties were a single CERCLA facility because it "has had no connection with the property upon which the

MGP operated" other than the migration of contamination.  *Id.* at 125.  Similarly, in *New York v. Gen. Elec. Co.*, No. 1:14-CV-747, 2017 WL 1239638 (N.D.N.Y. Mar. 31, 2017), the court found distinct facilities where "[t]he properties were not operated as a single unit together, and had no connection until the State placed 53 Luzerne's waste onto 51 Luzerne."  *Id.* at *21.

Here, the North and South Landfills were owned by Plaintiff CI, its predecessors, or Plaintiff CCH.  For the last seventy-five years, the North and South Landfills have been operated and managed for a singular purpose: Plaintiffs' industrial and waste disposal needs.  There is no clear distinction in Plaintiffs' use of the North and South Landfills.

New York State has also addressed the North and South Landfills unitarily.  In 1984, New York State added the North and South Landfills as a single "New York State Inactive Hazardous Waste Disposal Site."  Dkt. No. 144-16 at 2.  The 2004 Consent Order and 2011 Remedial Design between NYSDEC and Plaintiff CCH both state that, "[t]he area of the North Landfill and South Landfill are collectively referred to herein as the 'Site.'"  *Id.* at 1.

Even Defendants recognize the commonality of the North and South Landfills.  Indeed, large sections of Defendants' briefing assumes the landfills are a single facility.  Defendants argue that corrective action on the North Landfill triggered the statute of limitations on the South Landfill as well.  A corrective action on the North Landfill could only trigger the statute of limitations on the South Landfill, however, if they constitute one facility.  *See, e.g.*, *Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883, 894 (S.D. Ohio 2012).

In sum, the Court finds that property under common ownership and used for a common industrial purpose, which is now widely contaminated by similar PCBs and was treated jointly in all remedial efforts, is a single CERCLA facility.  Accordingly, Defendants' arguments that they

are entitled to summary judgment for the North Landfill, regardless of their status as a covered party for the South Landfill, fails.

### 2. *Defendant County is an "Arranger"*

To make a *prima facie* case that Defendant County qualifies as an "arranger" under Section 107(a)(3), Plaintiffs must show that Defendant County "by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances ..."  42 U.S.C. § 9607(a)(3).  While "CERCLA does not specifically define what it means to 'arrang[e] for' disposal of a hazardous substance, ... under the plain language of the statute, an entity may qualify as an arranger … when it takes intentional steps to dispose of a hazardous substance."  *Burlington Northern and Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 610-11 (2009) (citations omitted).

Defendant County admits that it placed dredged spoils on the southwest corner of the South Landfill.  Dkt. No. 173 at 11-12.  Defendant County nonetheless asserts that it is not an arranger because there is no evidence explicitly demonstrating that the spoils were contaminated with PCBs, and that even if they were contaminated, Defendant County did not have knowledge that dredged spoils were hazardous at the time it arranged for their disposal on the South Landfill.

The Court agrees with Defendant County that knowledge that a material was hazardous is a requirement for arranger liability under CERCLA.  In *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. 599, the Supreme Court held that Shell Oil was not liable as an arranger under CERCLA when its sale resulted in spills during transport.  *Id*. at 611.  The Court found that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  *Id*.  The Court held that Shell Oil did not intend to dispose of a hazardous substance merely by making a sale of that substance, and

therefore was not an arranger.  *Id.*  The *Burlington Northern* Court found an intent requirement in

CERCLA for the disposal of hazardous substances.  *Id.*

Two district courts in the Second Circuit have read "intentional steps to dispose of a

hazardous substance," to require knowledge that the disposal was of a hazardous substance.

*Robert H. L., Inc. v. Woodbine Bus. Park, Inc.*, No. 5:13-CV-1393, 2019 WL 1130121, *34

(N.D.N.Y. Mar. 12, 2019); *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 422-23 (E.D.N.Y. 2017).

The Court finds the reasoning of these cases persuasive.  Requiring knowledge that a substance is

hazardous comports with CERCLA's deterrent focus.  A party cannot be deterred from

"contracting away" its "responsibility for polluting if it did not even realize it was polluting."

*Town of Islip*, 245 F. Supp. 3d at 423; *Robert H. L., Inc.*, 2019 WL 1130121, at *34 (holding that

"undesirable conduct necessarily cannot be deterred where the party engaging in such conduct

does so unknowingly").  Moreover, the *Burlington Northern* Court states that "an entity may

qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a *hazardous*

substance."  *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 611 (emphasis added).  If "knowledge

of the hazardous nature of the material were irrelevant—and the only inquiry was whether the

alleged arranger intended for the disposal of some material—the Supreme Court could have

omitted the term "'hazardous' from its holding[.]"  *Town of Islip*, 245 F. Supp. 3d at 423; *see also*

*Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 678 (3d Cir. 2003).

Here, however, it is clear that Defendant County knew that the Ley Creek contained

hazardous substances.  Newspaper articles throughout the 1960s highlighted the industrial

pollution into Ley Creek and the odor emanating from Ley Creek.  *See* Dkt. Nos. 164-2, 164-3,

164-4, 164-6.  The articles include a six-point plan to fight Ley Creek odors, a state senator

seeking aid on Ley Creek pollution, and a survey on the sources of Ley Creek pollution.  *See* Dkt.

Nos. 164- 2, 164-3, 164-4.  The lede of a 1964 article states, "Ley Creek, which has the title of 'Old Stinky' because of its heavy polution [sic] by industrial waste and sewage, will be surveyed for flood control and perhaps, for an eventual clean-up."  Dkt. No. 164-6.  Defendant County had knowledge that Ley Creek was contaminated when it dredged the creek in the early 1970's.

Additionally, Defendant County argues it is not an arranger because there is no proof that the dredged spoils were in fact hazardous.  CERCLA liability, however, "may be inferred from the totality of the circumstances as opposed to direct evidence."  *Niagara Mohawk Power Corp.*, 596 F.3d at 136.  Here, there is ample circumstantial evidence that the spoils contained PCBs.  A 1987 Onondaga County Department of Health memo identified PCB contamination in Ley Creek spoils from the dredging project.  Dkt. No. 164-7 at 2.  Although there is no indication that the spoils sampled were taken from the North or South Landfill, there is no reason to doubt the PCB contamination did not stretch the entirety of the creek.  Defendant County, in a letter from the County of Onondaga to the U.S. Department of Justice, agreed, stating, "[t]he evidence here is undisputed that PCBs were released (and continue to be released) into Ley Creek from GM-IFG Syracuse and they are transported the length of Ley Creek to its point of discharge into Onondaga Lake. … There is no rational basis to limit the cleanup to that portion of Ley Creek upstream of the Route 11 Bridge."  Dkt. No. 164-11 at 8.  The Court therefore finds that the Ley Creek spoils at issue were contaminated with PCBs.

Because Defendant County arranged for the disposal of hazardous materials onto the South Landfill, and knew that the material was hazardous, the Court finds Defendant County liable as an arranger.[5]

---

[5] Because the Court finds arranger liability, it need not address whether the County is an operator under CERCLA.

### 3. *Defendant City is an Arranger*

As part of their *prima facie case*, Plaintiffs assert that Defendant City is a covered party because it is both an operator and arranger under CERCLA. Defendant City operated a municipal landfill on the South Landfill between November 1961 and the end of 1963. Dkt. No. 161-2 at ¶¶ 112-20.

The Court finds that Defendant City is an arranger because of its use of the municipal landfill. Similar to the above, Defendant City, in its reply brief, argues that it is not an arranger because there is no evidence that its disposals were hazardous and, even if there were, it did not have knowledge that the material was hazardous. *See* Dkt. No. 193 at 40. And similarly, the Court finds that there is sufficient circumstantial evidence to establish the materials were in fact hazardous and that Defendant City had sufficient knowledge of the hazardousness.

The Second Circuit has unambiguously supported the use of circumstantial evidence to establish CERCLA liability, particularly where the passage of time makes direct evidence impracticable:

> Each hazardous waste site is unique in its combination of commercial activities, substances present, and history. In situations like the present case, the type of evidence, be it direct or circumstantial, and its quality, is to some degree impeded by the passage of time and the lack of business records reflecting the day-to-day operations of the industries then present at the Water Street Site. The available evidence of who did what at the relevant site is often dependent on inference. When determining CERCLA liability, "there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain." *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001).

*Niagara Mohawk Power Corp.*, 596 F.3d at 131. Accordingly, municipal landfills routinely give rise to CERCLA liability. *See e.g.*, *B.F. Goodrich Co.*, 958 F.2d at 1200 (holding that municipal

landfilling is subject to CERCLA claims because "the concentration of hazardous substances in municipal solid waste – regardless of how low a percentage – is not relevant in deciding whether CERCLA liability is incurred"); *Town of Union, N.Y. v. Travelers Indem. Co.*, 906 F. Supp. 782, 789 n.7 (N.D.N.Y. 1995) ("Clearly, one who operates a landfill does so with the expectation and intention that people and companies will 'dispose of' refuse at that landfill. Where, as here, that refuse includes hazardous materials, the landfill operator cannot escape liability by simply arguing that it never 'expected or intended' that type of discharge at its site").

Additionally, an Onondaga County report found that the industrial waste was "mixed with the domestic collections for disposal." And, in 1964, Defendant City dredged Ley Creek to obtain cover material for its landfill wastes. *See* Dkt. No. 161-1 at 11. As discussed above, the PCB pollution by GM predates 1964, and the creek's pollution was well known at this time. As such, the Court holds that Defendant City is an arranger for the site.

## G.  Plaintiffs' Prima Facie Case

As discussed above, to establish a *prima facie* case of liability, a plaintiff must show that (1) the defendant fits one of the four classes of responsible parties outlined in Section 9607(a); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under the Act. *Price Trucking Corp.*, 748 F.3d at 80; *B.F. Goodrich Co.*, 958 F.2d at 1198. The Court has found that Defendants are responsible parties and that Plaintiff CCH has incurred costs.

The remaining elements of the *prima facie* case are uncontroverted. The site is a facility, there is a release of hazardous substances at the facility, Plaintiff CI has incurred costs, and the

costs and response actions conform to the National Contingency Plan.  Plaintiffs combined

motions for summary judgment on liability are granted.

**H.      Petroleum Exclusion**

Defendant City moves for partial summary judgment on damages related to the removal of

petroleum waste.  The definition of hazardous substance under CERCLA excludes petroleum,

stating that, "[t]he term does not include petroleum, including crude oil or any fraction thereof

which is not otherwise specifically listed or designated as a hazardous substance under

subparagraphs (A) through (F) of this paragraph."  42 U.S.C. § 9601(14).  The exclusion does not

apply to waste petroleum that has been contaminated with an additional hazardous substance

during or after its use.  *White Plains Hous. Auth. v. Getty Properties Corp.*, No. 13-CV-6282,

2014 WL 7183991, *9 (S.D.N.Y. Dec. 16, 2014); *State v. Almy Bros.*, No. 90-CV-818, 1998 WL

438523, *6–8 (N.D.N.Y. July 31, 1998).  Plaintiffs have claimed damages for the excavation,

hauling, and disposal of 2,882 tons of oil waste, representing $132,946.66.

The Court finds that there is no evidence in the record to support a finding that the

petroleum included any hazardous substances, as defined by CERCLA.  The only evidence

presented to the Court is the certified waste manifest, in which Plaintiffs certified that the

petroleum was not hazardous.  Accordingly, the Court finds the petroleum waste did not include

any foreign hazardous substances and the exception applies.  *See, e.g.*, *Members of Beede Site*

*Grp. v. Fed. Home Loan, Mortg. Corp.*, 968 F. Supp. 2d 455, 461 (D.N.H. 2013).

**I.       Contract Indemnification Claim**

Plaintiff CI alleges that response costs pursuant to CERCLA are covered by a 1972 option

agreement with Defendant County with the following indemnification clause:

> [T]he County shall defend, save harmless and indemnify Crouse-
> Hinds from and against any and all claims against Crouse-Hinds
> and any and all loss, costs, damages or expenses (including without
> limitation reasonable counsel fees) which Crouse-Hinds may suffer,
> sustain or incur by reason of bodily injury (or claims thereof) to any
> person whomsoever, or any damages to the … personal property of
> Crouse-Hinds … arising or which shall be claimed to have arisen
> out of the County's use of the premises described herein before
> transfer of title, and the County's use, if any, of Crouse-Hinds'
> property not herein described, whether or not the occurrence giving
> rise to such claims shall have been due to the negligent act or
> omission of the County or its contractors, agents or invitees.

Dkt. No. 143-19 at 6-7.  Defendant County has moved for summary judgment, asserting that the

indemnification agreement does not cover decades-later CERCLA liability, that CERLCA

liability did not "arise out of" Defendant County's use of the premises, that Plaintiff CI waived its

contract indemnification claim, and that the doctrine of estoppel should apply.

First, the Court finds that the indemnification clause is sufficiently broad to encompass

CERCLA liability, generally.  The Second Circuit has held that broad indemnity clauses, that

predate CERCLA and make no mention of environmental liability, can nonetheless cover

CERCLA liability.  *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 14-16 (2d Cir. 1993).  In

*Olin*, the indemnification clause covered "all liabilities, obligations and indebtedness of Olin

related to [its aluminum business] ... as they exist on the Closing Date or arise thereafter."  *Id.* at

15.  The Second Circuit held that the language evidences "clear and unmistakable intent" that the

defendant indemnified the plaintiff for all liabilities related to the site, "even future unknown

liabilities."  *Id.* at 16.  The court, therefore, rejected the defendant's argument that the agreement

was required to include a clear and express waiver of CERCLA rights.  *Id.*; *see also Schiavone v.*

*Pearce*, 79 F.3d 248, 252 (2d Cir. 1996) (applying a pre-CERCLA indemnification agreement to

CERCLA liability where the indemnification agreement covers "any obligation or liability ...

43

under or pursuant to any legal action ..., based on a cause of action arising out of or attributable to the operations or activities of [defendant]").

Conversely, in *Buffalo Color Corp. v. Alliedsignal, Inc.*, 139 F. Supp. 2d 409 (W.D.N.Y. 2001), the court found an indemnification which limited the types of liability to "claims/obligations arising from leases, licenses, permits, other binding arrangements, and capital commitments" as well as "claims made by employees or third parties resulting from (i) substances discharged on/after the closing date; (ii) fault or defect, patent or latent, in the physical assets; (iii) exposure of certain employees to products described in an exhibit" to not cover CERCLA liability. *Id.* at 420. And in *Georgia-Pac. Consumer Prod., LP v. Int'l Paper Co.*, 566 F. Supp. 2d 246 (S.D.N.Y. 2008), the court found a pre-CERCLA indemnification agreement which limited liabilities to those existing on the closing date to preclude CERCLA liability. *Id.* at 251-52.

Defendant County agreed to indemnify Plaintiff "against any and all claims … arising or which shall be claimed to have arisen out of the County's use of the premises described herein." The Court finds the indemnification clause sufficiently broad to cover future liability of a statute that the clause predates. There is no limitation on the type of liability found in *Buffalo Color*, and there is no limitation on the timing of liability found in *Georgia-Pac. Consumer Prod.* Rather, the only limitation on liability is that it arises out of Defendant County's use of the premises as described in the Option Agreement. As such, the clause is broad enough to cover CERCLA liability, generally.

Defendant County argues that the indemnification clause does not apply here because the CERCLA liability does not arise from the County's use of the property. Defendant County states that its disposal of the spoils and construction of a dike were consistent with the Option

Agreement.  Therefore, Defendant County argues, that its "use" did not damage the property.  *See* Dkt. No. 143-2 at 24.  The Court does not find any support in the Option Agreement to support the argument that the indemnification clause does not apply to claims arising from use consistent with the Option Agreement.  In fact, that is exactly the scenario the indemnification covers.  The indemnification clause covers both "use of the premises described herein" and "the County's use, if any, of Crouse-Hinds' property not herein described."  Future claims related to the placement of spoils and construction of dikes, as is the case here, is therefore covered by the indemnification clause.

The Court also finds no merit that Plaintiff CI waived its claim.  "Waiver is an intentional relinquishment of a known right and should not be lightly presumed[.]"  *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968 (1988).  Defendant County argues that Plaintiff CI waived its right to recover for future environmental damages by declining to have spoils removed by the County's contractor when it had the opportunity.  "In order to establish a waiver it is necessary that there be an 'intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it.'"  *United Commodities-Greece v. Fid. Int'l Bank*, 99 A.D.2d 974, 975 (1st Dep't 1984) (quoting *Werking v. Amity Ests., Inc.*, 2 N.Y.2d 43, 52 (1956)).  Plaintiff CI, therefore, could not intentionally relinquish its right to indemnification for "any claim" brought against it until a claim had been brought against it.  As such, the Court declines to find that Plaintiff CI waived its indemnification claim in 1973 by declining the County's contractor's offer to remove the spoils because its right to sue for "any claim" did not exist until the 2004 consent order, at the earliest.

Lastly, the Court declines to exercise its equitable power to estop Plaintiff CI from bringing this claim.  Estoppel "is imposed by law in the interest of fairness to prevent the

enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 106 (2006). Evidence that a party was misled or that a party "significantly and justifiably relied on that conduct" is an "essential element of estoppel[.]" *Id.* at 106-07. Defendant County argues that it was deprived of its opportunity to have the contractor remove the spoils by Plaintiff CI's alleged agreement with the contractor to leave spoils on its property, and therefore it should not be liable because the spoils were ultimately left on Plaintiff's property.

The Court declines to grant this extraordinary remedy. Defendant County agreed to indemnify against any claim that arises out of the placement of spoils on Plaintiff's property. Plaintiff was not required to then remove or assist in the removal of the spoils pursuant to the Option Agreement.

## J.      Defendant City's Cross Claim against Defendant County

Defendant County has moved for summary judgment on Defendant City's cross claim pursuant to Section 113(f)(1) of CERCLA. Section 113(f)(1) provides a right of contribution to PRPs that have been sued under Section 107. *See* 42 U.S.C. § 9613(f)(1). Because Plaintiffs' Section 107 action survives summary judgment, Defendant City has a valid Section 113(f)(1) claim against a co-defendant. *See Branch Metal Processing, Inc. v. Bos. Edison Co.*, 952 F. Supp. 893, 914 (D.R.I. 1996). The motion for summary judgment is therefore denied.

## K.      Defendant County's Counter Claim against Plaintiff CCH

Defendant County has moved for summary judgment against Plaintiff CCH on its counter claim pursuant to Section 107(a) of CERCLA. Defendant County, however, has only incurred

costs of litigation as a response cost. Litigation costs are only recoverable under CERCLA where the costs "identify potentially responsible parties," "communicate with state agencies," or otherwise advance the cleanup efforts. *Major v. Astrazeneca, Inc.*, No. 5:00-CV-1736, 2006 WL 2640622, *17 (N.D.N.Y. Sept. 13, 2006). Defendant County has made no effort to demonstrate the purposes of its claimed response costs, and its motion for summary judgment is therefore denied.

## V. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

ORDERS that Defendant City's motion *in limine* (Dkt. No. 150) is **DENIED**; and the Court further

ORDERS that Defendant County's motion *in limine* (Dkt. No. 147) is **DENIED**; and the Court further

ORDERS that Defendant City's motion for summary judgment (Dkt. No. 151) is **GRANTED in part** and **DENIED in part**;[6] and the Court further

ORDERS that Defendant County's motion for summary judgment (Dkt. No. 143) is **DENIED**; and the Court further

ORDERS that Plaintiffs' combined motions for summary judgment (Dkt. Nos. 160, 161) are **GRANTED**; and the Court further

ORDERS that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

---

[6] Defendant City's motion for summary judgment is granted solely with respect to damages related to the petroleum exclusion and otherwise denied.

Dated: October 25, 2021
        Albany, New York

Mae A. D'Agostino
U.S. District Judge